1  RONALD J. TENPAS
   Assistant Attorney General
2  Environment and Natural Resources Division
   BRIAN C. TOTH
3  Trial Attorney
   Natural Resources Section
4  Environment and Natural Resources Division
   United States Department of Justice
5  Environment & Natural Resources Division
   P.O. Box 663
6  Washington, D.C. 20044-0663
   Telephone:  (202) 305-0639
7  Facsimile:  (202) 305-0506

8  Attorneys for Defendant Rural Utilities Service

9
                    UNITED STATES DISTRICT COURT
10                  NORTHERN DISTRICT OF CALIFORNIA
                        SAN FRANCISCO DIVISION
11

12  CENTER FOR BIOLOGICAL DIVERSITY,       )
    KENTUCKY ENVIRONMENTAL                 )   Civ. No. 08-cv-1240-EMC
13  FOUNDATION, and SIERRA CLUB,           )
                                           )
14              Plaintiffs,                )
                                           )
15  v.                                     )
                                           )
16  RURAL UTILITIES SERVICE, a federal agency  )   Date:   June 11, 2008
    within the United States Department of Agriculture,  )   Time:  10:30 a.m.
17                                         )   Honorable Edward M. Chen
                Defendant.                 )   Courtroom C, 15th Floor
18  _____)

19
20              DEFENDANT'S DECLARATION OF BRIAN C. TOTH

21          I, Brian C. Toth, do hereby declare as follows:

22          1.      Attached hereto as Attachment 1 is a copy of the complaint in Montana Environmental

23  Information Center v. Rural Utilities Service, Civ. No. 07-1311-JR (D.D.C. July 23, 2007).  I obtained

24  the document through the Public Access to Court Electronic Records ("PACER") system.

25          2.      Attached hereto as Attachment 2 is a copy of the complaint in Sierra Club v. United States

26  Department of Agriculture, Rural Utilities Service, Civ. No. 07-1860-EGS (D.D.C. Oct. 16, 2007).  I

27  obtained the document through the PACER system.

28

1    3.    Attached hereto as Attachment 3 is a printout of the following web page:

2   http://www.eenews.net/Greenwire/print/2008/04/14/7 (visited April 17, 2008).

3
4   I declare under penalty of perjury that the foregoing is true and correct.

5   Executed this 30th day of April 2008.

6                                                    /s/ Brian C. Toth
                                                    BRIAN C. TOTH
7                                                   Trial Attorney
                                                    Natural Resources Section
8                                                   Environment and Natural Resources Division
                                                    United States Department of Justice
9                                                   Environment & Natural Resources Division
                                                    P.O. Box 663
10                                                  Washington, D.C. 20044-0663
                                                    Telephone:  (202) 305-0639
11                                                  Facsimile:  (202) 305-0506

12                                                  Attorney for Defendant Rural Utilities Service

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on April 30, 2008, I electronically filed the foregoing DEFENDANT'S

3   DECLARATION OF BRIAN C. TOTH and attachments, with the Clerk of the Court using the CM/ECF

4   system, which will send notification of such filing to the following:

5            Marianne G Dugan
             mdugan@mdugan.com,mariannedugan@yahoo.com
6
             Matthew D. Vespa
7            mvespa@biologicaldiversity.org

8
    Dated: April 30, 2008                          /s/ Brian C. Toth
9                                                   BRIAN C. TOTH
                                                    Attorney for Defendant Rural Utilities Service
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

MONTANA ENVIRONMENTAL
INFORMATION CENTER
107 West Lawrence
Helena, MT  59624
(406) 443-2520                                            Civil No. _____

CITIZENS FOR CLEAN ENERGY
289 Boston Coulee Road
Great Falls, MT 59405
(406) 736-5791

SIERRA CLUB
85 Second Street, 2nd Floor
San Francisco, CA 94105
(415) 977-5500

                         Plaintiffs,

v.

MIKE JOHANNS
Secretary, U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

JAMES ANDREW
Administrator, Rural Utilities Service
1400 Independence Ave, SW
Washington, DC 20250

RICHARD FRISTIK,
Senior Environmental Protection Specialist,
Rural Utilities Service
1400 Independence Ave, SW
Washington, DC 20250

                         Defendants.

_____

```
Toth Decl. Attach. 1
```

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This case challenges large-scale federal investment in new coal-fired power plants that will substantially increase emissions of greenhouse gases responsible for global warming. The Supreme Court has affirmed that "[t]he harms associated with climate change are serious and well recognized," Massachusetts v. EPA, --- U.S. ---, 127 S.Ct. 1438, 1455 (2007). Congress is working to pass sweeping legislation to cut greenhouse gas emissions and promote reliance on renewable energy, and the President's proposed 2008 budget expressly seeks to divert energy subsidies away from new coal-fired power plants.  Nevertheless, the Rural Utilities Service ("RUS"), an arm of the U.S. Department of Agriculture, is preparing to lend billions of federal dollars to build several new coal plants that will accelerate climate change and eliminate the market for cleanly generated electricity.

2.     Most recently, RUS has elected to "participate in funding" the Highwood Generating Station near Great Falls, Montana.  The plant will emit an estimated 2.8 million tons of greenhouse gases every year.  In addition, RUS is in the midst of the funding process for at least seven other larger coal plants — a 600-MW plant in Missouri, a 385-MW plant in Wyoming, a 400-MW plant in Idaho, a 750-MW plant in Florida, a 750-MW coal plant in Oklahoma, and two 278-MW coal plants in Kentucky —  each of which will emit even greater quantities of greenhouse gases than the recently approved Highwood coal plant.

3.     Not only will these plants increase the United States' contribution to global warming for decades to come, they will do significant environmental damage regionally and locally.  The Highwood coal plant is illustrative: it will severely degrade air quality and likely contaminate a major aquifer in north central Montana, and it will destroy a National Historic Landmark.  Nevertheless, RUS has decided to fund the project without fully disclosing, much

less addressing, its environmental impacts, and without considering viable alternatives to avoid

environmental harm. This failure violates both the National Environmental Policy Act ("NEPA")

and the National Historic Preservation Act ("NHPA").  With this lawsuit, Plaintiffs seek to

enjoin RUS from approving federal loan funds until the agency confronts the global warming

impacts and other environmental consequences of financing new coal plants.

## JURISDICTION AND VENUE

4.      This action arises under the National Environmental Policy Act ("NEPA"), 42

U.S.C. §§ 4321, et. seq., the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 407 et

seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal

question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§

2201-2202.

6.      Venue lies in the District of Columbia pursuant to 28 U.S.C.

§ 1391(e) because a substantial part of the events or omissions giving rise to this case occurred in

this District, and because federal defendants Andrew, Johanns, and Fristik reside in this District.

## PARTIES

7.      Plaintiff Montana Environmental Information Center ("MEIC") is a member-

supported advocacy and public education organization that works to protect and restore

Montana's natural environment.  Since its founding in 1973, MEIC has lobbied and litigated both

at the state and federal level to prevent degradation of air quality and natural resources.  Recent

MEIC advocacy efforts have focused on reducing pollutant emissions from coal-fired power

plants nationwide.  In this regard, MEIC has participated in a successful federal lawsuit to

compel the U.S. Environmental Protection Agency ("EPA") to withdraw national policy

guidance that had discouraged state permitting agencies from considering the use of integrated

gasification and combined cycle ("IGCC") combustion technology to reduce carbon dioxide and other pollutant emissions from coal-fired power plants.

8.    With respect to the Highwood coal plant specifically, MEIC has led efforts to inform the public, elected officials, and responsible agencies about less polluting alternatives to building an old-technology coal-fired power plant.  At every opportunity in the environmental review and permitting process, MEIC has submitted comments aimed at promoting renewable energy sources, efficiency, and conservation, and thereby reducing emissions that threaten public health and contribute to global warming.

9.    Citizens for Clean Energy ("CCE") is a public interest, non-profit organization dedicated to promoting clean, efficient, cost-effective energy alternatives to coal-fired power. Over the past year, CCE has led a public education campaign to inform Montana citizens and their elected officials about less-polluting alternatives to building a CFB coal-fired power plant in Great Falls.  To this end, CCE has organized lectures and screenings to raise public awareness about global warming; CCE has sponsored several expert presentations on clean energy alternatives to electricity generated by coal-fired power plants; CCE has held a series of informational meetings specifically about the Highwood coal plant across nortern Montana in Great Falls, Havre, Fort Benton, and on the Rocky Boy Reservation; and CCE has presented testimony and submitted extensive comments regarding the plant's adverse impacts on public health, local agriculture, and the Great Falls National Historic Landmark.

10.    Plaintiff Sierra Club is a nationwide conservation organization with more than 750,000 members.  The Sierra Club is America's oldest, largest and most influential grassroots environmental organization.  The mission of the Sierra Club is:  "To explore, enjoy and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems

and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments." To this end, Sierra Club is engaged in a nationwide campaign to champion clean energy in the face of an unprecedented rush to build new coal-fired power plants. Sierra Club is currently litigating to stop construction of new coal plants across the country; Sierra Club is leading advocacy efforts to pass legislation to curb greenhouse gas emissions, and Sierra Club is collaborating with state and local governments to promote energy efficiency, conservation, and increased reliance on renewable energy.

11.     MEIC, CCE, and Sierra Club members live and work in Montana communities, including Great Falls, Fort Benton and the Rocky Boy Reservation, that will be adversely impacted by pollution from the coal plant. They include senior citizens, people with asthma, pregnant women, and other individuals who are especially vulnerable to harm from exposure to very fine particulate matter ($PM_{2.5}$), ground-level ozone, mercury, and other harmful pollutants. MEIC and CCE members also include landowners that live and farm in the immediate vicinity of the proposed Highwood coal plant, and many more farmers and ranchers that are severely impacted by drought associated with global warming and climate change. Federal defendants' decision to fund the Highwood coal plant injures the interests of MEIC, CCE, Sierra Club and their members in breathing clean air, drinking clean water, and curbing greenhouse gas emissions that cause global warming.

12.     MEIC, CCE, and Sierra Club members also include Montana residents who take an active interest in visiting, researching, and preserving the Great Falls Portage National Historic Landmark and the larger Lewis and Clark Historic Trail. Federal defendants' decision to fund a project that will destroy the Landmark and substantially diminish the overall integrity

of the Historic Trail injures the aesthetic, educational, and cultural interests of these MEIC and CCE members.

13.     Defendant Mike Johanns is the U.S. Secretary of Agriculture and in that capacity has final responsibility for actions taken by RUS.  Mr. Johanns is sued in his official capacity.

14.     Defendant James Andrew is the Administrator of the RUS and in that capacity has management responsibility for the actions of RUS, including the agency's compliance with NEPA and the NHPA.  In this regard, Mr. Andrew has been in direct correspondence with the Executive Director of the Advisory Council of Historic Preservation regarding adverse impacts to the Great Falls Portage National Historic Landmark, where the Highwood coal plant would be sited.  Mr. Andrew is sued in his official capacity.

15.     Defendant Richard Fristik is the Senior Environmental Specialist at RUS and in that capacity has supervisory authority over RUS compliance with NEPA and the NHPA.  Mr. Fristik has actively overseen both the NEPA and NHPA process for the Highwood coal plant, and has served as the lead RUS contact for consulting agencies and organizations and the public.  Mr. Fristik is sued in his official capacity.

**RUS FINANCING FOR COAL-FIRED POWER PLANTS**

16.     RUS' Electric Program, one of many USDA "Rural Development" programs, is an artifact of President Roosevelt's depression-era campaign to assist impoverished farming communities by "electrifying" the West.  While rural communities now generally have access to affordable electricity, RUS still has considerable funds at its disposal to spend in areas that, in many cases, are no longer rural.  For example, RUS has awarded electric companies nearly $1 billion in low-interest loans to serve the booming suburbs of Atlanta, Georgia and Tampa,

Florida.  In this case, the Highwood coal plant would serve the city of Great Falls, as well as the suburbs of Billings, Montana.

      17.    While RUS has long been a major funding source for electric cooperatives and larger power companies, interest in obtaining RUS funding for new coal plants has risen exponentially in recent years — a reflection of the ongoing industry rush to build new coal plants in advance of anticipated carbon regulation.  As a result, RUS is now in the midst of the financing process for at least seven new coal plants across the country.

      18.    Each year, these plants would release millions of tons of greenhouse gases representing a significant percentage of total U.S. greenhouse gas emissions.  In addition, these plants would emit substantial quantities of mercury, very fine particulate matter smaller than 2.5 microns ("$PM_{2.5}$"), and other dangerous pollutants that can travel long distances, causing geographically widespread air pollution problems across the country.  Yet RUS has made no effort to assess the big picture environmental consequences of funding new coal plants.  Rather, RUS apparently takes the view that coal plant projects are welcome to available Rural Development funds on a first-come, first-serve basis, regardless of impacts on climate change, on regional air and water quality, and even on the rural agricultural resources that RUS was established to protect.

### The RUS Loan Program

      19.    Under the Rural Electrification Act of 1936 ("RE Act"), RUS is authorized to make loans for "rural electrification and for the purpose of furnishing and improving electric and telephone service in rural areas."  7 U.S.C. § 902(a).  As the RE Act's implementing regulations make clear, loan funding is available exclusively for projects that primarily benefit rural communities, so-called "RE Act beneficiaries."  See 7 C.F.R. § 1710.2 (defining "RE Act

beneficiary" to mean "a person, business, or other entity that is located in a rural area").  Loans

for facilities that serve non-RE Act beneficiaries, such as Great Falls residents, may be approved

only if: "(1) The primary purpose of the loan is to furnish and improve service for RE Act

beneficiaries and; (2) The use of loan funds to serve non-RE Act beneficiaries is necessary and

incidental to the primary purpose of the loan."  Id. § 17.104(b) (emphasis added);

20.     Further, before RUS can finance any new generating facility such as a new coal-

fired power plant, the agency must confirm that there are no existing sources of power that can

provide equally affordable electricity.  Thus, the loan regulations authorize RUS to make loans

for new generating facilities only "where the rates offered by other power sources would result in

a higher cost of power to the consumers," or "where no adequate and dependable source of

power is available to meet the consumers' needs."  7 C.F.R. § 1710.254(a).  Thus, RUS

regulations effectively set up a presumption against funding new power plants — i.e., new power

plants may be funded only where there is no alternative power source or available options would

be more expensive to customers than power from a new plant.

21.     This presumption is reflected in clear direction set forth in the President's 2008

proposed budget, which states the following:

> Since 1992, RUS electric loans have been used primarily to finance transmission,
> distribution and upgrades to generation facilities.  During this time, generation has
> been deregulated and has become a more commercial operation.  With the
> increased needs for all aspects of electricity provision, and to ensure adequate
> funding for rural areas, RUS loans will continue to focus on transmission,
> distribution, and upgrading generation facilities.  Construction of new generation
> facilities should be financed through the commercial market.

Budget of the United States Government, Fiscal Year 2008 - Appendix, Department of

Agriculture, 146 (Feb. 2007) (emphasis added).

22.     Despite this announced policy to avoid funding new power plants, RUS is now on track to fund several new coal plants in addition to the Highwood plant.  These plants include a 600-MW pulverized coal plant in Missouri, a 385-MW plant in Wyoming, a 400-MW coal plant in Idaho, a 750-MW coal plant in Florida, a 750-MW coal plant in Oklahoma, and two 278-MW coal plants in Kentucky.  Individually and collectively, these federally financed projects will have enormous, long-lasting impacts on the environment.

### THE HIGHWOOD COAL PLANT'S ENVIRONMENTAL IMPACTS

23.     The environmental impacts of financing the Highwood coal plant are illustrative of impacts that RUS financing of coal plants threatens across the country.

### RUS' NEPA Analysis For The Highwood Plant

24.     On May 10, 2007, RUS issued a Record of Decision ("ROD") to "participate in funding" the Highwood plant, which is proposed by a group of eastern Montana electricity cooperatives known as the Southern Montana Electric Generation and Transmission Cooperative ("SME").  The ROD represents the culmination of the NEPA process, which began with initial scoping of issues in the fall of 2004.  Defendant Fristik announced the Release of a Draft Environmental Impact Statement ("EIS") in June 2006 and invited the public to send him comments.  In January 2007, Mr. Fristik announced the release of the Final EIS, and again invited comments.  While Plaintiffs provided Mr. Fristik with substantial new information regarding viable alternatives to building a polluting old-technology plant, RUS declined to revisit its cursory alternatives analysis.  Instead, the agency adopted SME's preferred alternative to build the Highwood coal plant virtually on top of a National Landmark.

25.      While final RUS loan approval is contingent on further financial analysis, RUS

has formally concluded its environmental review.  At this point in the financing process, RUS

will not condition loan approval on any further effort to avoid or mitigate environmental harm.

### The Highwood Coal Plant

26.      The 250-megawatt ("MW") Highwood plant would utilize a conventional

circulating fluidized bed ("CFB") boiler, which would require extremely expensive retro-fitting

in order to capture $CO_2$ emissions.  Other plant facilities would include a turbine building, smoke

stack, coal yard, high-voltage switchyard, cooling tower, water lines, transmission lines, a new

rail spur, access roads, and a sprawling landfill for disposal of coal ash and other solid waste

generated by the plant.  In addition, the facility would incorporate four wind turbines to generate

an additional 6 MW of power.  All of this new infrastructure would industrialize approximately

800 acres of prime agricultural land in Montana's fertile "Golden Triangle," 8 miles east of the

city of Great Falls.  This land is classified under county regulations as prime agricultural land of

statewide importance.

### Global Warming Impacts

27.      The Highwood coal plant would contribute to global warming, emitting 2.8 million

tons of greenhouse gases each year, including 2.1 million tons of $CO_2$ (nearly 1 ton of $CO_2$ per

megawatt hour ("MWH") of electricity generated) and the $CO_2$ equivalent of 67 million tons of

methane and nitrous oxide, which are even more potent greenhouse gases than $CO_2$.  The cumulative

impact of these emissions, in combination with emissions from other new coal-fired power plants,

will be very large.   For example, the Missouri coal plant for which the Associated Electric Coop.,

Inc. ("AEC") is seeking RUS funding, would emit an anticipated 6.8 million tons of $CO_2$ per year.

The Florida plant for which the Seminole Electric Cooperative is seeking RUS funding would emit

an estimated 5.7 million tons of $CO_2$ per year. Together, the Highwood plant, the AEC plant, the Seminole Electric plant, and at least five other foreseeable RUS-financed plants, could account for a significant share of U.S. greenhouse gas emissions. Yet RUS has never considered how financing coal plants, along with other greenhouse gas emitting projects, contributes to climate change.

28.    As the Supreme Court has recently made clear, federal agencies can no longer afford to ignore the monumental threats posed by climate change. A National Research Council Report, cited by the Court, has "identifie[d] a number of environmental changes that have already inflicted significant harms, including the global retreat of mountain glaciers, reduction in snow-cover extent, the earlier spring melting of rivers and lakes, and the accelerated rate of rise of sea levels during the 20th century relative to the past few thousand years." Massachusetts v. EPA, 127 S. Ct. at 1455 (internal quotations, citations, and alterations omitted) (emphasis added). In future, the consequences of global warming promise to be even more severe. According to Michael MacCracken, a climate scientist, also favorably cited by the Court, "qualified scientific experts involved in climate change research have reached a strong consensus that global warming threatens (among other things) a precipitate rise in sea levels by the end of the century, severe and irreversible changes to natural ecosystems, a significant reduction in water storage in winter snowpack in mountainous regions with direct and important economic consequences, and an increase in the spread of disease." Id. at 1456 (internal quotations and citations omitted) (further noting MacCracken's "eerily prescient" observation that rising ocean temperatures may contribute to the ferocity of hurricanes).

29.    Global warming is already resulting in many of these identified harms in Montana. As of 1997, precipitation had decreased by up to 20 percent in many parts of the state, and over the last decade of drought, precipitation has declined much further. "Over the next

century," RUS concedes that "Montana's climate may change even more." FEIS, Vol. I at 3-46. The consequences, as itemized by RUS, include: "glaciers melting and disappearing in Glacier National Park and elsewhere in the Rocky Mountains; a potential decline in the northern Rockies snowpack and stressed water supplies both for human use and coldwater fish; … an increase in the frequency and intensity of wildfires as forest habitats dry out …; loss of wildlife habitat; possible effects on human health from extreme heat waves and expanding diseases like Western equine encephalitis, West Nile virus, and malaria; [and] possible impacts on the availability of water for irrigated and dryland crop production alike." Id.

### Regional Air Pollution

30.    In addition to global warming impacts, the Highwood coal plant threatens serious harm to regional air quality.

31.    According to RUS estimates, the Highwood coal plant would emit thousands of tons per year of "criteria" pollutants regulated under the federal Clean Air Act's National Ambient Air Quality Standards ("NAAQS"): 944 tons per year of Nitrogen Oxides ("NOx"), a principal contributor to acid rain and formation of ground-level ozone and $PM_{2.5}$; 443 tons per year of Sulfur Dioxide ("$SO_2$"), which in combination with NOx, causes acid rain and regional haze; 1,117 tons per year of carbon monoxide, which exacerbates heart conditions and impairs central nervous system function; and 366 tons per year of particulate matter smaller than 10 microns ("$PM_{10}$"), which causes serious heart and lung problems.

32.    Of particular concern, RUS assumes that all 366 tons of $PM_{10}$ to be emitted from the Highwood coal plant will, in fact, be comprised of $PM_{2.5}$, the smallest and most dangerous class of particulates or "soot" regulated under the NAAQS. $PM_{2.5}$ consists of microscopic solid or liquids particles that lodge deep into the human lungs. Based on extensive peer-reviewed

research published over the past ten years, the U.S. Environmental Protection Agency ("EPA") has recognized that even short-term inhalation of $PM_{2.5}$ is linked with premature mortality, heart attacks, and respiratory diseases, including lung cancer and asthma. In an effort to reduce $PM_{2.5}$-related hospital admissions and deaths each year, EPA has recently set more stringent NAAQS for $PM_{2.5}$, reducing the former 24-hour maximum standard by nearly half, from 65 micrograms per cubic meter ($\mu g/m^3$) to 35 $\mu g/m^3$.

33.     Direct emissions from the Highwood coal plant are expected to result in $PM_{2.5}$ concentrations of 33.3 $\mu g/m^3$, or 95% of the new 24-hour NAAQS. While this dramatic increase in $PM_{2.5}$ pollution is, in itself, a cause for concern, actual concentrations of $PM_{2.5}$ will almost certainly be higher because RUS projections do not account for "secondary" $PM_{2.5}$ that is formed in the atmosphere by chemical reactions of gases such as NOx, which the plant will emit in large quantities. Given that scientific research demonstrates that secondary emissions of $PM_{2.5}$ generally account for 50% of total $PM_{2.5}$ concentrations, construction and operation of the Highwood coal plant could result in $PM_{2.5}$ concentrations of more than 60 $\mu g/m^3$, nearly double the health-based NAAQS for $PM_{2.5}$. Nevertheless, the Highwood coal plant would not be subject to any emissions limits or even monitoring requirements for $PM_{2.5}$.

34.     Further, the Highwood coal plant would emit hazardous air pollutants, including radionuclides such as radon, and toxic heavy metals, including an estimated 34.5 pounds of mercury each year through 2018, and nearly 22 pounds of mercury per year thereafter. In Montana, mercury is already a serious problem. The state has issued several health advisories based on mercury contamination in fisheries in many rivers, streams, and lakes, and the Montana Department of Fish Wildlife and Parks has recently reported mercury poisoning in bald eagles. As mercury moves up the food chain, it "biaccumulates," becoming increasingly concentrated.

Thus, even very low levels of mercury in a lake may translate into high mercury concentrations in fish. This in turn translates into high mercury blood levels in people and animals that consume the contaminated fish. In humans, mercury causes serious developmental and neurological problems, especially in fetuses and young children. This is a particularly grave concern in Montana because a disproportionate number of people rely on wild-caught fish and game for food. This is especially true of Native Americans living downwind of the proposed Highwood coal plant. Thus, additional mercury pollution from the Highwood coal plant is a major public health issue.

35.     Finally, pollution from the Highwood coal plant threatens the integrity of premier public lands. Modeling completed by SME indicates that emissions from the plant will contribute to noticeable impairment of visibility in pristine federal Class I areas — Glacier National Park and the Bob Marshall, Gates of the Mountains, and Scapegoat Wilderness Areas in Montana.

### Water Pollution

36.     The Highwood coal plant also threatens water. Against the backdrop of rising temperatures, prolonged drought, and increasing stress on scarce water resources, the Highwood coal plant would pump up to 3,500 gallons of water per minute out of the Missouri River, consuming 4 to 5 million gallons of water per day.

37.     At the same time, the plant would create a toxic waste stream that could easily contaminate the remaining supply of local ground and surface water. Every day, the Highwood coal plant would produce approximately 225 tons of solid waste, equating to four full rail cars of waste in the form of fly ash, bed ash, and sludge or "slurry" — left-overs from the coal-burning process. Nearly all of this waste would be dumped into on-site landfills lined only with soils

found on the premises.  These so-called "monofills" would sit on top of a major aquifer, the

Madison Aquifer, which feeds Giant Springs, one of the largest fresh water springs in the world,

and a critical source of water for agricultural, commercial, and public use.

38.     Solid waste from coal-fired power plants contains most of the mercury and other

toxic heavy metals such as arsenic, cadmium, chromium, and selenium that are originally present in

raw coal.  As a result, coal combustion waste is often highly toxic.  Nevertheless, coal combustion

waste is exempted from federal hazardous waste regulations, and it remains wholly unregulated

under state law in Montana.

39.     This regulatory gap poses a major threat to water quality.  As the National Academy

of Sciences cautioned in a 2006 report, "Contaminants derived from CCRs [coal combustion

residues] have the potential to enter drinking water supplies, surface water bodies, or biota at

unacceptable concentrations …, thereby creating risks to human health and the environment."

National Research Council of the National Academies, Managing Coal Combustion Residue In

Mines, 59 (2006).  In fact, "EPA has identified numerous cases of water contamination related to

CCR landfills and surface impoundments that, in many cases, have caused considerable

environmental damage."  Id. at 4.

40.     At the Highwood facility, inadequate disposal of coal combustion waste threatens the

sort of water contamination and environmental damage that has occurred at power plant sites across

the country.  Soils at the Highwood plant site would be used to form "clay liners" and topsoil covers

for several landfills or "monofills."  Yet this soil is classified by the U.S. Department of Agriculture

("USDA") as "very limited" for many industrial uses, including use for clay liner material and for

cover of landfills.  Under the USDA's rating system, "very limited" means "that the soil has one or

more features that are unfavorable for the specified use. The limitations generally cannot be

overcome without major soil reclamation, special design, or expensive installation procedures.  <u>Poor performance and high maintenance can be expected</u>." USDA, Natural Resources Conservation Service, <u>National Cooperative Soil Survey, Material Source Ratings For Cascade County Area, Montana</u> (March 2007) (emphasis added).  At the Highwood plant, "poor performance" of on-site soils entails leakage, or "leaching," of toxic heavy metals into the groundwater aquifer and/or toxic runoff into surface water, including the Missouri River, which runs nearly adjacent to the project site.  Nevertheless, the Highwood coal plant would be exempt from any liner or groundwater monitoring requirements based on a preliminary ground-water demonstration that has never been made available to the public.

### Loss of Historic Landmark Status

41.     In addition to polluting air and water in Montana, the Highwood coal plant would destroy a rare piece of history.  Under the current proposal, the coal plant would be built at the edge of the Great Falls Portage National Historic Landmark, with four wind turbines located inside the landmark boundaries.

42.     The Portage National Historic Landmark commemorates the arduous overland trek that the Lewis and Clark Expedition's Corps of Discovery made around the Great Falls of the Missouri River in 1805.  The Landmark's primary feature is a campsite where the party stayed for nearly a month, and where Sacagawea, Lewis and Clark's Native American guide, recovered from a life-threatening fever.  From here, it is still possible to look up and down the Missouri River as it flows undisturbed through a channel of high bluffs.  Looking eastward, back toward the site of the proposed coal plant, there is still an unobstructed view of high plains that eventually run into the Highwood Mountains.  As described by the National Park Service, which is charged with managing the Landmark, "[t]he unspoiled quality of the setting indicates a purity of place similar to that

experienced by the Expedition.  The lack of manmade intrusions is both visible and audible, defined by the natural soundscape, clear air, and an unimpeded night sky."  <u>Secretary Of The Interior's Report To The Advisory Council On Historic Preservation In Accordance With Section 213 Of The National Historic Preservation Act: Evaluation of the Proposed Highwood Generating Station on the Great Falls Portage National Historic Landmark</u>, 8 (2007) ("Park Service Report").  For all of these reasons, the Park Service regards the site as "one of very few segments of the [Lewis and Clark National Historic Trail] that retains a high degree of natural and cultural integrity relatively free of modern human developments and intrusive activities." <u>Id.</u> at 9.

43.     Construction of the Highwood coal plant facilities would unavoidably destroy the Portage Landmark's integrity.  As explained by the Park Service, "[t]he integrity of the NHL [National Historic Landmark] is based mainly on its current condition of large, open, historic and natural landscapes relatively free of intrusions.  The proposed HGS [Highwood Generating Station] and ancillary features would constitute a broad and wide-scale impact on the surrounding landscape. …  This industrial scale development would introduce modern design into the NHL and the site's view shed, radically changing features that are vital to the character of the place." <u>Id.</u> at 9.

44.     For these reasons, the Park Service concluded in its official report to the Advisory Council on Historic Preservation that "the HGS would have widespread, profound, and adverse impacts on the NHL, and would require a critical review of its integrity; <u>a process that would likely lead to the loss of NHL status for most, if not all, of the [portage] route</u>." <u>Id.</u> at 2 (emphasis added).  Ultimately, absent removal to a different site, construction of the Highwood coal plant will cause, in the Park Service's words, "an irreparable loss to the national heritage of our country." <u>Id.</u> at 9.

45. Upon receipt of the Park Service's report, John Fowler, the executive director of the Advisory Council, promptly sent Defendant Andrew a letter strongly endorsing the Park Service's findings:

> The ACHP has reviewed the [Park Service] report and feels that it provides an excellent review of the significance and integrity of the Great Falls Portage NHL. In the words of the … report itself, "no other site along the … Lewis and Clark National Historic Trail so aptly represents the extreme hardships of the Expedition while being so geographically accessible to the general visiting public."

Letter from John M. Fowler to James M. Andrew, 1 (June 29, 2007). Based on the "inadequacy of proposed treatment measures to avoid, minimize, or mitigate" harm to the Landmark, Mr. Fowler formally requested that RUS re-evaluate funding for the Highwood coal plant. Id. at 2.

### NEED FOR THE HIGHWOOD COAL PLANT

46. All of the environmental harms that flow from construction of the Highwood coal plant are avoidable. Fundamentally, there is no need to build a new 250-MW coal-fired power plant at the Great Falls Portage National Historic Landmark, or anywhere else, to satisfy the limited demands of SME's customer base in sparsely populated eastern Montana.

47. SME seeks federal funding to acquire an 85% interest in the Highwood coal plant, which translates into an 85% share of electricity generated by the proposed coal plant — roughly 212.5 MW of power. According to SME, the expiration of contracts for electricity from the Bonneville Power Administration ("BPA") will leave its member cooperatives in urgent need of electricity that can only be supplied reliably and affordably by a new SME-owned coal plant. However, SME's asserted need to build a coal plant is premised on inflated projections of customer demand and under-estimates of capital and operating costs. When actual demand and true costs are taken into account, it becomes apparent that building the Highwood coal plant is an exceedingly expensive way to generate far more energy than SME will ever use.

18

48.     From the outset, SME has greatly exaggerated its energy needs.  SME has 24,785
customers, or cooperative members, with a total of 33,935 meters.  Data from the Department of
Energy ("DOE") reveals that the combined load demand of all of SME's member cooperatives is
53.9 average megawatts (aMW).  Since SME is already guaranteed to receive 20 aMW from the
Western Area Power Administration ("WAPA"), it currently faces a shortfall of approximately 33.9
aMW when its BPA contracts expire in 2008-2011.  An 85% share in the Highwood coal plant
would make up this shortfall six times over.

49.     Even during rare periods of highest peak demand, the Highwood coal plant would
generate far more power than SME could possibly use.  DOE reports that the combined annual peak
usage of all of SME's member cooperatives totals 124 MW.  In reality, peak energy usage by
individual co-ops does not occur simultaneously, so it is highly unlikely that SME would ever need
to supply 124 MW at one given time.  However, even in the extremely unusual worst-case scenario,
SME's interest in the Highwood coal plant would provide 88 MW of surplus power.  Perhaps for this
reason, SME has already negotiated to sell a firm 65 MW (fully 26% of the plant's total output) to an
off-system Idaho purchaser, and this is only a small portion of the electricity that SME intends to sell
on the wholesale power market.

50.     Nevertheless, SME insists that its customer base will grow and that eventually, its
cooperative members will use their full share of electricity from the plant.  However, SME's
projections of future demand are based on the wholly unsupported assumption that growth rates in
rural, eastern Montana service areas will substantially exceed growth rates projected by the U.S.
Census Bureau.

51.     In sum, U.S. government data from both DOE and the Census Bureau confirm that
SME's energy needs are quite modest and will likely remain so into the foreseeable future.

Nevertheless, RUS has accepted SME's stated need for 212 MW of power without question. This failure to undertake an independent evaluation of SME's legitimate energy needs has fundamentally skewed and corrupted the analysis of less environmentally harmful alternatives to building the Highwood coal plant.

## FAILURE TO CONSIDER ALTERNATIVE SOLUTIONS

52.     Having accepted SME's inflated projections of consumer demand, RUS has also accepted SME's contention that the only way to ensure a reliable, affordable supply of electricity is to build a 250-MW CFB coal plant. Based on this assumption, RUS summarily dismissed environmentally preferred alternatives to meet SME's genuine energy needs.

53.     Specifically, RUS declined to give any meaningful consideration to alternatives involving: wind power and other renewable energy sources; advanced fossil fuel technologies such as IGCC, which enables more efficient coal combustion, more effective and affordable control of $CO_2$ emissions, and a more manageable waste stream; power purchase agreements for electricity from existing generating facilities; and conservation measures that would significantly reduce energy consumption. According to the agency, it would be impracticable and prohibitively expensive to generate the amount of power SME is seeking (187 MW at the time the FEIS issued, and 212 MW under the terms of the ROD) without building a CFB coal plant. However, RUS never evaluated, based on available government data, whether alternatives could meet the much smaller energy needs that SME is actually facing in the foreseeable future. For instance, RUS never considered whether wind, which is becoming increasingly available at low cost in Montana, could viably generate 40 or 50 MW for SME.

54.     Further, in dismissing alternatives as too expensive, RUS never undertook a fair cost comparison based on realistic assumptions about the cost of generating electricity at the Highwood

coal plant.  Instead, RUS relied on SME's capital and operating cost projections.  However, SME's own estimate of capital costs for the Highwood coal plant has recently risen from $470 million in 2004, to $515 million in 2005, to $678 million in 2006, and this estimate is still too low.  An independent financial assessment commissioned by the City of Great Falls, which proposes to finance 15% of the plant, cautioned that capital costs are more likely to be in the neighborhood of $720 million.  Moreover, the assessment reported that: 1) SME has assumed an unrealistic operating capacity in the first two years of operation; 2) SME's fuel cost assumptions should be adjusted upward from $8.50 per ton of coal to $12 per ton — a 41% increase; and 3) SME's estimated operating costs should be adjusted upward from $5.23 to $9.86 per megawatt hour ("MWH") — an 89% increase.  Based on these revised cost assumptions, along with other factors such as the potential for monopoly pricing on rail service, the forecasted price of undelivered Highwood electricity rises from $45.12 per MWH to $57.90 per MWH or higher by the year 2020.

55.    Because the recent independent analysis did not attempt to account for the cost of future carbon regulation, the price of electricity from the Highwood coal plant would likely exceed its estimate of $57.90 per MWH.  Based on recent studies and cost forecasts, carbon regulation could potentially add over $64 million to the Highwood coal plant's annual operating expenses.

56.    SME has stated publicly that it would seek to retrofit the new plant to allow for carbon capture and sequestration if and when the appropriate technology becomes available.  However, even if SME were able to effectively control its carbon emissions, this retrofit would come at major expense that would be passed on to SME customers.

57.    When the true costs of building and operating the proposed Highwood coal plant are acknowledged, the price of electricity from alternative energy sources is more than

competitive with the price of electricity from the Highwood coal plant. A particularly

compelling example is wind. In a February 2007 report prepared for the Montana Public Service

Commission, the state's default energy supplier NorthWestern Energy disclosed that the final

cost of electricity generated by the Judith Gap Wind Farm Project in central Montana was $41.99

per megawatt-hour during its very first year of operation, and this rate includes so-called

"firming" costs to ensure a balanced electrical system even when the wind is not blowing. Thus,

there is already a wind farm operating in Montana that is successfully providing electricity on a

large scale at much cheaper rates than SME can promise. Moreover, the Judith Gap Wind farm

has announced that approximately 50 MW of new power will be coming on line in 2008 and will

be available for purchase at a cost of $31 per MWH, with additional firming costs running

between $10 and $15 per MWH. In short, there is available wind power to meet SME's energy

needs at significantly lower cost than the estimated cost of power from the proposed Highwood

coal plant.

   58. Notwithstanding significant new information indicating that the Highwood coal

plant will cost much more than anticipated, and that alternative energy solutions would cost

much less than anticipated, RUS has declined to revisit its environmental analysis to consider

alternatives. The ROD issued on May 10, 2007 represents the agency's final determination to

reject alternatives and select an old-technology CFB coal plant for funding.

### FAILURE TO CONSIDER ALTERNATIVE SITES

   59. The ROD also represents a final decision to site the Highwood coal plant virtually on

top of the Great Falls Portage National Historic Landmark. Building the coal plant at this location

will necessarily destroy the Landmark. Yet RUS has never undertaken its own independent

investigation to determine whether it is feasible to locate the plant at a different site.

60.     Rather, RUS effectively foreclosed meaningful consideration of alternative sites very early in the project planning process. During the initial "scoping" phase, RUS issued a misleading notice that failed to disclose any potential threat to the Landmark.  Rather than identifying proposed site locations, the notice directed readers to a cursory "Site Selection Study" on the RUS website. That study misidentified the location of the currently proposed site, and explicitly "dropped" the current Landmark site as an alternative because "the project would be located on property of significant historical activity — the beginning of the trail for the portage route taken by Lewis and Clark." Site Selection Study, 2-1 (Oct. 2004).  Thus, RUS misled the public, the Advisory Council, the State Historic Preservation Office ("SHPO"), and the National Park Service into believing the Landmark was not in any danger.

61.     It was not until mid-2006, when the Draft Environmental Impact Statement ("DEIS") was poised to issue, that RUS finally alerted the Council to the preferred alternative site's actual location.  At this point in the process, RUS had already narrowed the siting alternatives down to the Landmark site and the nearby "Industrial" site, which was already viewed by SME and the agency as a non-starter.  In effect, at the Draft EIS stage, the decision to site the Highwood Plant at the Landmark site had been made, and the decision has never been revisited.

62.     RUS never undertook its own investigation of available sites.  Instead, it relied on SME's cursory report identifying and rejecting all but the Landmark and Industrial sites.  By the time the NHPA consultation process was finally initiated,  As Defendant Fristik made clear that "the site selection process" was "off the table."  Meeting Notes, U.S. Department of Agriculture, Rural Utilities Service, Southern Montana Electric Generation and Transmission Cooperative, Inc., Proposed Highwood Generating Station NHPA S. 106 Consulting Parties Meeting (Mar. 7, 2007).

## RUS' DUTIES UNDER NEPA AND THE NHPA

63.     Failure to consider alternatives that would avoid harm to natural and historic resources violates the requirements of NEPA and the NHPA.

### NEPA's Requirements

64.     NEPA is our "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  As such, NEPA requires federal agencies to consider environmental harms and the means of preventing them in an Environmental Impact Statement ("EIS") before approving "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  "Major federal actions" include projects such as the Highwood coal plant that are "entirely or partly financed … by federal agencies."  40 C.F.R. § 1508.18(a).

65.     In preparing an EIS, agencies must disclose the "environmental consequences" of a proposed agency action, including its direct, indirect, and cumulative impact.  See id. §§ 1502.16(a), (b), 1508.8.  As defined by regulation, cumulative impact means "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such other actions." Id. § 1508.7.

66.     Further, agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action.  40 C.F.R. § 1502.14(a).  Consideration of alternatives is "the heart of the environmental impact statement," because it compels agencies to "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public."  Id.

67.     To elicit this informed comparison of alternatives, NEPA's implementing

regulations specifically demand that an EIS consider: "[e]nergy requirements and conservation

potential of various alternatives and mitigation measures;…[n]atural or depletable resource

requirements and conservation potential of various mitigation measures;… [and] historic and

cultural resources."  Id. §§ 1502.16(e), (f), (g).  In addition, the EIS must "state how alternatives

considered in it and decisions based on it will or will not achieve the requirements of [NEPA]

and other environmental laws and policies," which, in this case, include the Clean Air Act and

the NHPA.  Id. § 1502.2(d).

68.     In the event circumstances change, or new information becomes available,

agencies must address any significant implications for the proposed action in a supplemental EIS

("SEIS").  NEPA's implementing regulations provide that agencies "[s]hall prepare supplements

to either draft or final environmental impact statements if: … [t]here are significant new

circumstances or information relevant to environmental concerns and bearing on the proposed

actions and its impacts."  Id. § 1502.9(c)(1)(ii).

### NHPA's Requirements

69.     Similar to NEPA, the NHPA seeks to ensure that federal agencies fully consider

the consequences of proposed actions in time to avoid damage to national historic and cultural

resources.  Thus, "prior to the approval of the expenditure of any Federal funds," the Act

requires that federal agencies "take into account the effect of the undertaking on any district, site,

building, structure, or object that is included in or eligible for inclusion in the National Register."

16 U.S.C. § 470f.

70.     Where, as here, a federally funded project will "directly and adversely affect" a

National Historic Landmark, "the head of the responsible federal agency shall to the maximum

extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking." Id. § 470h-2(f) (emphasis added).  In keeping with this mandate, the NHPA's implementing regulations establish a consultation process in which the Advisory Council, the appropriate State Historic Preservation Office ("SHPO"), and other interested stakeholders help identify and evaluate impacts to the affected historic property, see 36 C.F.R. §§ 800.3-6, and "seek ways to avoid, minimize or mitigate the adverse effects."  Id. § 800.6(b).

71.     Importantly, agencies must initiate consultation early in the project planning process "so that a broad range of alternatives may be considered."  36 C.F.R. § 800.3(c).  While agencies may "[c]onduct[] or authoriz[e] nondestructive project planning activities before completing [the consultation process]," these activities must not "restrict the subsequent consideration of alternatives to avoid, minimize or mitigate the undertaking's adverse effects on historic properties."  Id.

### FIRST CAUSE OF ACTION

**Violation of NEPA**
(Failure To Assess Cumulative Impacts On Global Warming)

72.     Plaintiffs reallege and incorporate paragraphs 1 through 69.

73.     RUS neglected to consider the cumulative impact of greenhouse gas emissions from the Highwood coal plant in combination with emissions from other coal plants, including seven other coal plants that are currently seeking RUS financing.

74.     NEPA requires RUS to consider "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7; see also

id. § 1502.16(b). As NEPA's implementing regulations expressly state, "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." Id. § 1508.7.

75.     Financing the Highwood coal plant in combination with at least seven additional coal plants that will annually emit millions of tons of carbon dioxide and other greenhouse gases has a collectively significant impact on global warming. The EIS' failure to address this critically important issue is arbitrary, capricious, an abuse of discretion and contrary to NEPA and its implementing regulations. See id.; 5 U.S.C § 706(2)(A).

## SECOND CAUSE OF ACTION

### Violation of NEPA
(Arbitrary Definition of Purpose and Need)

76.     Plaintiffs hereby reallege and incorporate paragraphs 1 through 73 above.

77.     RUS violated NEPA in allowing SME to define "purpose and need" for federal financing without regard to its member cooperatives' true energy needs.

78.     In preparing an EIS, the agency must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13. Accordingly, the range of alternatives considered in the EIS flows from the agency's statement of purpose and need. If the purpose and need are defined too narrowly, the agency's consideration of alternatives is artificially constrained, defeating NEPA's fundamental aim to identify workable alternatives in time to avoid environmental harm.

79.     For the Highwood coal plant EIS, RUS accepted SME's definition of purpose and need without independently evaluating SME's unjustified assertions regarding consumer demand. Based on the arbitrary assumption that SME needs 187MW or more of electricity, RUS declined to consider alternatives that could satisfy a more modest energy demand, and in fact

issued a ROD that contemplates a 212.5 MW power supply for SME.  Thus, from the outset of

the NEPA process, the agency's definition of purpose and need improperly skewed the range of

alternatives selected for consideration in the EIS.  This violates NEPA and its implementing

regulations.  See id. §§ 1502.13, 1502.14.  RUS' failure to state a legitimate purpose and need

was arbitrary, capricious, an abuse of discretion, and contrary to law.  See id.;  5 U.S.C. §

706(2)(A).

**THIRD CAUSE OF ACTION**

**Violation of NEPA**
(Failure to Consider a Reasonable Range of Alternatives)

80.    Plaintiffs reallege and incorporate paragraphs 1 through 77.

81.    RUS violated NEPA in selecting the Highwood coal plant for funding without

giving detailed consideration to any alternatives other than building a CFB coal plant.

82.    Under NEPA, RUS was required to "[r]igorously explore and objectively evaluate

all reasonable alternatives," with explicit attention to their respective "[e]nergy requirements and

conservation potential."  40 C.F.R. § 1502.14(a).  Yet, aside from the "no action alternative,"

RUS considered only one alternative: locating the same CFB coal plant a few miles away from

the currently proposed site.  Thus, RUS summarily dismissed alternatives involving renewable

energy including wind power, energy efficiency and conservation measures, advanced

technologies such as IGCC, and power purchase agreements — all of which were suggested in

comments submitted by Plaintiffs.  This exclusive focus on conventional coal combustion

foreclosed an informed choice between viable alternatives to meet SME's energy needs.  RUS'

failure to consider a reasonable range of alternatives was arbitrary, capricious, an abuse of

discretion, and contrary to NEPA and its implementing regulations.  See id.; 5 U.S.C. §

706(2)(A).

## FOURTH CAUSE OF ACTION

### Violation of NEPA
(Supplemental EIS)

83.     Plaintiffs reallege and incorporate paragraphs 1 through 80.

84.     RUS violated NEPA in failing to supplement its alternatives analysis in light of significant new information that became available after the FEIS issued.

85.     RUS has accepted SME's contention that there are no economically viable alternatives to building a CFB coal plant, and it has therefore declined to give detailed consideration to wind power, advanced technologies such as IGCC, and purchase agreements for power from existing sources.  However, new information indicates that electricity from the Highwood coal plant would be far more expensive than assumed in the FEIS and that alternative sources of energy are likely to be more affordable than anticipated.  First, an independent financial assessment revealed that SME underestimated its capital and operating costs, and that its electricity rates will be substantially higher than anticipated.  Second, the release of new studies and forecasts has made it possible to project cost increases due to future carbon regulation.  Third, recent reports confirm that wind power is being generated on a large scale both reliably and affordably in Montana.  In light of this new information, RUS must revisit its assumptions regarding the relative costs of alternatives, taking into account a realistic estimate of the cost of electricity from the Highwood coal plant.

86.     In addition, RUS has received a new report from the Department of Interior indicating that the Great Falls Portage site will likely lose its National Historic Landmark status if the Highwood coal plant it built as currently proposed.  In light of this new information, RUS must revisit its analysis of alternative sites.

87.     Under NEPA, the RUS "<u>shall</u>" prepare supplemental analysis to address "significant new circumstances or information" that is relevant to an informed choice among alternatives.  40 C.F.R. § 1502.9(c)(1)(ii).  RUS' failure to supplement its analysis for the Highwood coal plant to account for significant new information bearing on the feasibility of alternatives is arbitrary, capricious, an abuse of discretion, and contrary to NEPA and its implementing regulations.  <u>See</u> <u>id</u>; 5 U.S.C. § 706(2)(A).

### FIFTH CAUSE OF ACTION

**Violation of NEPA**
(Failure To Assess Harms From Inadequate Solid Waste Disposal)

88.     Plaintiffs reallege and incorporate paragraphs 1 through 73.

89.     RUS violated NEPA in failing to take a hard look at a critically important aspect of the Highwood coal plant proposal: disposal of 225 tons of toxic coal combustion waste per day in unlined landfills.  The USDA's own data cautions that soils at the coal plant site are unsuitable for use in landfills.  Moreover, failure of unlined landfills at power plant sites across the country is well-documented.  As the National Academy of Sciences has made clear, mercury and other toxic heavy metals such as arsenic, cadmium, chromium, and selenium can, and do, leach out of coal plant landfills, contaminating ground and surface water.  Nevertheless, the EIS fails to mention that unsuitable soils may cause landfills at the Highwood coal plant to fail.  The EIS merely states that SME has completed a "No Migration Demonstration" (which has never been made available to the public), and that SME is therefore exempt from liner and groundwater monitoring requirements.

90.     The EIS' cursory treatment of a major public health issue provides no assurance that RUS has adequately considered the risks associated with dumping millions of tons of coal combustion waste into unlined landfills in an agricultural area near the banks of the Missouri

River. In failing to provide any detailed analysis of potential water contamination and

alternatives to protect water quality — for example, installing liners, a leachate detection system,

and a groundwater monitoring system — RUS violated basic NEPA requirements to fully

disclose environmental impacts and identify mitigation measures. See 40 C.F.R. §§ 1502.14(f),

1502.16. RUS' failure to give meaningful consideration to toxic waste disposal was arbitrary,

capricious, an abuse of discretion, and contrary to NEPA and its implementing regulations. See

id; 5 U.S.C. § 706(2)(A).

## SIXTH CAUSE OF ACTION

### Violation of NEPA
(Failure To Assess Compliance With Health-Based Clean Air Act Standards)

91.    Plaintiffs reallege and incorporate paragraphs 1 through 88.

92.    RUS violated NEPA in failing to assess whether pollution from the Highwood

coal plant will result in dangerous concentrations of $PM_{2.5}$.

93.    Under NEPA, an EIS must assess direct and indirect effects and disclose how

"alternatives considered in it and decisions based on it will or will not achieve the requirements

of [NEPA] and other environmental laws and policies" including the Clean Air Act's National

Ambient Air Quality Standards ("NAAQS"). 40 C.F.R. § 1502.2(d); see also id. § 1502.16(b).

Because the NAAQS are designed specifically to protect human health and safety, it is vital to

consider whether the emissions from a project, taking into account its direct and indirect effects,

will achieve the NAAQS.

94.    The EIS for the Highwood coal plant estimates that direct emissions from the

Highwood coal plant will result in $PM_{2.5}$ concentrations of 33.3 $\mu g/m^3$, or 95% of the 24-hour

NAAQS of 35 $\mu g/m^3$. When these emissions are combined with secondary $PM_{2.5}$ emissions from

the Highwood coal plant, $PM_{2.5}$ concentrations could be more than double the NAAQS — and

this does not account for other foreseeable development that will further increase $PM_{2.5}$

concentrations.  From the standpoint of public health, this is an issue of major concern.  Yet RUS

neglected to make any mention of it.  RUS' failure to assess $PM_{2.5}$ concentrations and disclose

potential NAAQS violations was arbitrary, capricious, an abuse of discretion and contrary to

NEPA and its implementing regulations.  See id.; 5 U.S.C § 706(2)(A).

## SEVENTH CAUSE OF ACTION

### Violation of the NHPA
(Failure to Comply With NHPA Consultation Requirements)

95.    Plaintiffs reallege and incorporate paragraphs 1 through 92.

96.    RUS violated the NHPA in failing to ensure meaningful consideration of

alternatives that would avoid siting the Highwood coal plant at the Great Falls Portage National

Historic Landmark.

97.    Under the NHPA, a federal agency "shall to the maximum extent possible,

undertake such planning and actions as may be necessary to minimize harm to such landmark,

and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to

comment on the undertaking."  16 U.S.C. § 470h-2(f) (emphasis added).  To this end, the

NHPA's implementing regulations require the agency to initiate consultation early in the

planning process, while it still retains the maximum range of options to avoid harm to historic

properties.  36 C.F.R. § 800.3(c).

98.    Here, RUS failed to involve consulting parties — the Montana SHPO, the

Advisory Council on Historic Preservation, and the National Park Service — until after the

agency had eliminated all but one, allegedly unworkable alternative to the current Landmark site.

Based on the agency's representations early in the process, consulting parties and the public were

under the misimpression that the current site had been rejected in order to protect the Landmark. By the time they were informed otherwise, the Draft EIS analysis had already been completed, and RUS made no further attempt to identify other sites away from the Landmark.

99.    In excluding consulting parties from the early stages of the planning process, RUS foreclosed any opportunity for them to participate in key siting decisions. This defies not only the timing requirements for NHPA consultation under 36 C.F.R. § 800.3(c), but also the overarching mandate under 16 U.S.C. § 470h-2(f) to "minimize harm" to Landmarks through thoughtful planning in cooperation with the Advisory Council.

## REQUEST FOR RELIEF

THEREFORE, Plaintiffs request that this Court:

1.    Declare that RUS violated NEPA and its implementing regulations in failing to consider the Highwood coal plant's cumulative impact on global warming;

2.    Declare that RUS violated NEPA and its implementing regulations in failing to state a legitimate purpose and need for the Highwood coal plant project;

3.    Declare that RUS violated NEPA and its implementing regulations in failing to analyze a reasonable range of alternatives;

4.    Declare that RUS violated NEPA and its implementing regulations in failing to prepare a supplemental environmental analysis to address new information bearing on the feasibility of alternatives to the proposed coal plant;

5.    Declare that RUS violated NEPA and its implementing regulations in failing to (1) disclose the potential for water contamination from toxic coal combustion waste, and (2) consider mitigation measures and alternatives to protect water quality;

6.      Declare that RUS violated NEPA and its implementing regulations in failing to assess PM$_{2.5}$ concentrations and failing to disclose NAAQS violations that are likely to follow construction of the Highwood coal plant;

7.      Declare that RUS violated the NHPA and its implementing regulations, in failing to prevent harm to the Great Falls Portage National Landmark through timely consultation;

8.      Invalidate the May 10, 2007 ROD;

9.      Issue an injunction prohibiting RUS from approving SME's loan application and disbursing funds pending compliance with NEPA and the NHPA;

10.     Award plaintiffs their reasonable fees, costs, and expenses, including attorneys fees, associated with this litigation; and

11.     Grant plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted this 20th day of July, 2007,

Douglas L. Honnold (D.C. Bar # 468323)
Abigail M. Dillen
Earthjustice
209 South Willson Avenue
Bozeman, MT  59715
(406) 586-9699
Fax: (406) 596-9695
dhonnold@earthjustice.org
adillen@earthjustice.org

Stephen E. Roady (D.C. Bar # 926477)
Earthjustice
1625 Massachusetts Avenue, N.W.
Washington, D.C.  20036
202-667-4500 Telephone
Fax: 202-667-2356
sroady@earthjustice.org

*Counsel for Appellants*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SIERRA CLUB<br>85 Second Street, 2nd Floor<br>San Francisco, CA 94105 | )<br>)<br>)<br>) |
| Plaintiff, | ) No. _____ |
| v. | )<br>) |
| UNITED STATES DEPARTMENT OF<br>AGRICULTURE, RURAL UTILITIES SERVICE<br>1400 Independence Ave., S.W.<br>Washington, D.C. 20250 | )<br>)<br>)<br>)<br>) |
| CHARLES F. CONNER IN HIS OFFICIAL CAPACITY<br>AS ACTING SECRETARY, UNITED STATES<br>DEPARTMENT OF AGRICULTURE<br>1400 Independence Ave., S.W.<br>Washington, DC 20250 | )<br>)<br>)<br>)<br>)<br>) |
| JAMES M ANDREW, IN HIS OFFICIAL CAPACITY<br>AS ADMINISTRATOR, RURAL UTILITIES SERVICE,<br>UNITED STATES DEPARTMENT OF AGRICULTURE<br>1400 Independence Ave., SW<br>Washington, DC. 20250 | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.  Plaintiff, Sierra Club, challenges Defendant United States Department of

Agriculture, Rural Utility Service's ("RUS"), approval of a massive coal-fired power plant

expansion project in Western Kansas without first complying with the National Environmental

Policy Act, 42 U.S.C. §§ 4321 – 4370f  ("NEPA").

2.     The proposed project, at the site of Sunflower Electric Power Corporation's
("Sunflower") existing 360 megawatt ("MW") coal-fired power plant in Holcomb, Kansas,
includes up to three new 700 MW coal-fired electric-generating units ("Holcomb Expansion
Project" or "Project").  It would be one of the nation's largest new sources of greenhouse gas
emissions.  If all three units are built, they would emit an estimated 14 million tons of carbon
dioxide into the air each year.  The new units will also emit other pollutants, including fine
particulate matter, sulfur dioxide and nitrogen oxides, all of which the U.S. Environmental
Protection Agency has concluded can cause significant adverse effects on human health and the
environment.  The global warming impacts of the proposed Project are so significant that the
Project has drawn the objections of the Attorneys General of California, Connecticut, Delaware,
Maine, New York, Rhode Island, Vermont and Wisconsin.

3      Despite the Project's significant effects on human health and the environment and
the significant public controversy this project has generated both within and outside of Kansas,
RUS failed to conduct any environmental analysis under NEPA before approving a number of
business agreements that are needed for the Project to be constructed and operated.

4.     The United States Department of Agriculture, initially through the Rural
Electrification Administration ("REA"), and, subsequently through RUS, has, since around the
time of organization of Sunflower's predecessor in the 1950s, provided financing for
Sunflower's electric-generation and transmission facilities.  In providing such financing, the
United States acquired extensive control over Sunflower's business, including the right to
approve any extensions or additions to Sunflower's electric-generation and transmission
facilities.

5.      RUS' approval of the Project without first preparing an environmental impact statement or otherwise analyzing the Project's environmental impacts and alternatives to the Project, including clean energy alternatives, violated NEPA.  RUS' violation of NEPA has deprived RUS, the citizens of Kansas, residents of downwind states and the nation with information that is critical to informed decisions on required government approvals for the proposed coal plant expansion project.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this action under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-706.

7.      Venue is proper in the District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(e) because Defendants reside in the District, and a substantial part of the events or omissions giving rise to the claim occurred in the District.

## PARTIES

8.      Plaintiff, Sierra Club, is the nation's oldest grassroots environmental organization. The Sierra Club files this lawsuit on behalf of itself and its members.  The Sierra Club has more than 750,000 members nationwide, including approximately 4,675 members in Kansas.  It is dedicated to the protection and preservation of the natural and human environment.  One of the Sierra Club's main priorities, both nationwide and in Kansas, is to address the urgent problems of global warming, air pollution and our dependence on dirty, nonrenewable energy sources such as coal.  The Sierra Club and its members have long-standing interest and expertise in these issues.

9.     The Sierra Club has been actively involved in the permitting process for the Holcomb Expansion Project, and in promoting clean, efficient, economically beneficial alternatives to the Project. The Sierra Club's Kansas Chapter has distributed tens of thousands of copies of informational documents regarding energy conservation and the benefits of wind power. The Sierra Club filed extensive comments on proposed air and solid waste permits required for the Project, dozens of its members testified at state-sponsored hearings on the draft permits, and Sierra Club has a pending lawsuit in Kansas state district court to require an evidentiary hearing on the proposed air permit.

10.    Sierra Club members live and work in communities and on farms in portions of Western Kansas where air quality is likely to be adversely impacted by air pollution from the Holcomb Expansion Project. They include senior citizens, people with asthma, and other individuals who are especially vulnerable to harm from exposure to very fine particulate matter (PM 2.5), sulfur dioxide, and other harmful air pollutants that will be emitted by the Project's new coal-fired electric-generating units. Sierra Club members, including farmers who live in Western Kansas and elsewhere, will be adversely affected by drought and extreme weather events that are expected to increase due to global warming, to which the Project's massive carbon dioxide emissions will make a significant contribution. RUS' approval of the Holcomb Expansion Project injures the interests of the Sierra Club and its members in breathing clean air and curbing greenhouse gas emissions that cause global warming.

11.    Sierra Club members in Western Kansas will also be adversely affected by the impacts that the Project will have on development of clean energy alternatives, including wind power, in Western Kansas. The project will flood the market with coal-generated electric power,

substantially impairing opportunities to meet electrical demand with clean energy alternatives, including wind power, which Western Kansas is especially well-suited to develop.  The Project will thereby substantially the diminish the opportunity for Sierra Club members in Western Kansas to receive the greater environmental and economic benefits that would result from development of clean energy alternatives, including wind.

12.    The RUS' failure to prepare an environmental impact statement or otherwise comply with NEPA causes procedural injury to Sierra Club and its members by depriving them the protection of NEPA analyses and procedures required to ensure that environmental impacts of, alternatives to, and mitigation measures for the Project are carefully evaluated and considered prior to Project approval.

13.    The RUS' failure to prepare an environmental impact statement or otherwise analyze the Project's environmental impacts and alternatives to the Project also deprives the Sierra Club and its members of the opportunity to participate in the development of such environmental analysis and alternatives, and thereby influence decision-making related to the Project, and further deprives Sierra Club and its members of information about the Project that they would likely use in their advocacy and public education efforts.

14.    The injuries to the Sierra Club and its members resulting from the unlawful and arbitrary actions complained of herein would be redressed by an award of the relief sought in this complaint.

15.    Defendant Rural Utilities Service ("RUS") is a federal agency within the United States Department of Agriculture.  The Department of Agriculture established RUS in 1994, in accordance with Congress' mandate set forth in the Federal Crop Insurance Reform and

Department of Agriculture Reorganization Act of 1994, 7 U.S.C. § 6942(a) ("Reorganization
Act").

  16. The Reorganization Act charged RUS with carrying out, among other things, an
electric loan program under the Rural Electrification Act of 1936, 7 U.S.C. §§ 901 et seq.
Under Section 902(a) of the Rural Electrification Act, RUS is authorized to make loans for the
purpose of furnishing and improving electric service in rural areas, and for the purpose of
assisting electric borrowers to implement demand side management, energy conservation
programs, and on-grid and off-grid renewable energy systems." 7 U.S.C. § 902(a). Section 904
of the Rural Electrification Act authorizes RUS to make loans for rural electrification to
corporations organized for the purpose of financing the construction and operation of generating
plants, electric transmission and distribution lines or systems for furnishing and improving of
electric service to rural areas, including by assisting borrowers to implement demand side
management, energy conservation programs, and on-grid and off-grid renewable energy systems.

  17. Prior to the Reorganization Act, the Rural Electrification Administration
("REA"), an entity created by executive order in 1935 and subsequently made a federal agency
within the United States Department of Agriculture by the Rural Electrification Act, was
authorized to administer the electric loan program under the Rural Electrification Act.

  18. Defendant Charles F. Conner is Acting U.S. Secretary of Agriculture and in that
capacity has final responsibility for actions taken by RUS. Mr. Conner is sued in his official
capacity.

19.     Defendant James M. Andrew is the Administrator of RUS and in that capacity has management responsibility for actions of RUS, including the agency's compliance with NEPA. Mr. Andrew is sued in his official capacity.

## STATUTORY BACKGROUND

20.     Congress enacted NEPA to "promote efforts which will prevent or eliminate damage to the environment."  42 U.S.C. § 4331.

21.     To fulfill this goal, NEPA requires federal agencies to analyze the environmental impacts of a particular action before proceeding with that action.  Id. § 4332(2)(C).  In addition, federal agencies must notify the public of their proposed projects and allow the public to comment on the fully-disclosed environmental impacts of those projects.  40 C.F.R. § 1501.2.

22.     The cornerstone of NEPA is the environmental impact statement ("EIS").  An EIS is required for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

23.     "Major federal action" includes actions with effects that may be major and which are potentially subject to Federal control and responsibility.  40 C.F.R. § 1508.18.

24.     Federal actions include "new and continuing activities, including projects . . . entirely or partly financed, assisted, conducted, regulated or approved by federal agencies."  40 C.F.R. § 1508.18(a).  Federal actions requiring an EIS often occur when a federal agency "[a]pprov[es] . . . specific projects, such as construction or management activities located in a defined geographic area."  40 C.F.R. § 1508.18(b).

25.     In an EIS, the federal agency must (1) explore all reasonable alternatives to an action, 42 U.S.C. § 4332(2)(C), 40 C.F.R. § 1502.14, (2) identify and disclose to the public all

impacts of the proposed action and each reasonable alternative, including direct, indirect and cumulative impacts, 42 U.S.C. § 4332(2)(c), 40 C.F.R. §§ 1502.16, 1508.7 – 1508.8, and (3) consider possible mitigation measures to reduce such impacts to the environment, 40 C.F.R. § 1502.14(f).

26.     The goals of an EIS are to "provide a full and fair discussion of significant environmental impacts" associated with a federal decision and to "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

27.     A federal agency must prepare a draft EIS and must request comments on the draft EIS from relevant federal agencies, interested state, local and tribal governments, the public, and other interested parties.  40 C.F.R. § 1503.1.  The federal agency must assess and consider any comments in preparing the final EIS.  40 C.F.R. § 1503.4(a).

## FACTUAL BACKGROUND

### RUS' Loans to and Control Over Sunflower's Predecessor

28.     Sunflower Electric Power Corporation is an electric generation and transmission corporation.  It provides electric power to six electric cooperatives in Western Kansas.

29.     The predecessor to Sunflower Electric Power Corporation was organized as Sunflower Electric Cooperative, Inc., in 1957, and subsequently changed its name, first to Sunflower Electric Power Corporation, and later to Sunflower Electric Holdings, Inc. ("Old Sunflower").

30.     Around the time that it was organized, the United States provided its first loan to Old Sunflower under the Rural Electrification Act.

31.     Over the years, the United States provided a number of direct loans and loan guarantees to Old Sunflower pursuant to the Rural Electrification Act, first through REA, and subsequently through RUS.

32.     Some of the loans guaranteed by the United States, through REA, were made by the Federal Financing Bank, a government corporation created by Congress that is under the supervision of the U.S. Department of Treasury.

33.     In connection with such loans and loan guarantees, Old Sunflower and the United States, first through REA and later through RUS, executed loan documents, including loan agreements and mortgages.

34.     The loan documents, including mortgages, provided the United States a security interest in Old Sunflower's assets.

35.     The loan documents, including loan agreements and mortgages, provided the United States, first through REA and later through RUS, extensive control over Old Sunflower's business.

36.     Mortgages executed and delivered by Old Sunflower to the United States include the following:

    a.     Mortgage dated as of June 5, 1958, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 20, 1970;

    b.     Supplemental Mortgage dated as of March 2, 1970, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 20, 1970;

    c.     Supplemental Mortgage, dated on or about May 24, 1974, which was filed for record with the Registrar of Deeds, Finney County, Kansas on May 28, 1974;

d.      Mortgage and Security Agreement dated as of February 9, 1976, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 26, 1976;

e.      Supplemental Mortgage dated as of July 7, 1976, which was filed for record with the Registrar of Deeds, Finney County, Kansas on July 7, 1976;

f.      Supplemental Mortgage dated as of January 10, 1978, which was filed for record with the Registrar of Deeds, Finney County, Kansas on January 13, 1978;

g.      Supplemental Mortgage dated as of November 3, 1980, which was filed for record with the Registrar of Deeds, Finney County, Kansas on November 4, 1980;

h.      Supplemental Mortgage and Security Agreement, dated as of November 1, 1984, which was filed for record with the Registrar of Deeds, Finney County, Kansas on March 21, 1985; and

i.      Consolidated Mortgage, Security Agreement and Financing Statement, dated as of May 5, 1988, which was filed for record with the Registrar of Deeds, Finney County, Kansas on May 5, 1988.

37.      Sunflower's primary resource for supplying electric power to the six electric cooperatives it supplies is Holcomb Station, located in Holcomb, Kansas.  Holcomb Station includes a 360 MW coal-fired electric-generating facility ("Holcomb I").

38.      Old Sunflower commenced site preparation for Holcomb I in May 1980, and the plant became operational on August 16, 1983.  The total cost of plant construction was approximately $ 465 million.

39.      On information and belief, the United States provided Old Sunflower construction financing for Holcomb I.

40.     The United States, through REA, approved the design of Holcomb I.

41.     On information and belief, the United States, through REA, approved the construction of Holcomb I.

### RUS' Approval of Old Sunflower's Restructuring

42.     In November 2002, Old Sunflower underwent a major restructuring.

43.     As part of the November 2002 restructuring, Old Sunflower changed its name to Sunflower Electric Holdings, Inc. ("SEHI").

44.     In connection with the November 2002 restructuring, a new corporation, SEP Corporation was organized.

45.      As part of the November 2002 restructuring, most of the assets of Old Sunflower, including Holcomb I, were transferred to SEP Corporation.

46.     As part of the November 2002 restructuring, SEP Corporation assumed much of Old Sunflower's debt to the United States.

47.     In connection with the 2002 restructuring, a new limited liability company was created named Holcomb Common Facilities, LLC ("HCF").

48.     As part of the 2002 restructuring, Old Sunflower transferred to HCF certain property, including property slated for use in connection with construction of new coal units at the site of the existing Holcomb I plant.

49.     The 2002 restructuring was designed to allow for the construction of one or more additional coal units at the Holcomb site.

50.     RUS participated in and approved the 2002 restructuring.

11

**RUS' Agreements With and Control Over Sunflower After Its Restructuring**

51.     Subsequent to the November 2002 restructuring, SEP Corporation changed its name to Sunflower Electric Power Corporation, effective March 24, 2003.

52.     As part of and subsequent to the November 2002 restructuring, Sunflower (f/k/a SEP Corporation) entered into additional financing agreements with the United States, through RUS, and other creditors.

53.     In connection with such additional financing agreements, Sunflower executed and delivered additional loan documents to the United States, including the following mortgages:

a.     Mortgage, Security Agreement and Financing Statement dated September 30, 2002, which was filed for record with the Registrar of Deeds, Finney County, Kansas on November 25, 2002;

b.     Amended and Restated Mortgage, Security Agreement and Financing Statement, dated June 1, 2003, which was filed for record with the Registrar of Deeds, Finney County, Kansas on July 25, 2003;

c.     Consolidated Mortgage, Security Agreement and Financing Statement dated as of April 22, 2004, which was filed for record with the Registrar of Deeds, Finney County, Kansas on April 23, 2004; and

d.     Supplement to Consolidated Mortgage, Security Agreement, and Financing Statement, dated as of July 26, 2007, which was filed for record with the Registrar of Deeds, Finney County, Kansas on August 22, 2007.

54.     The mortgages executed and delivered to the United States by both Old Sunflower and Sunflower generally provide the United States a first lien on the respective corporation's assets, including electric-generation and transmission facilities.

55.     On information and belief, the Consolidated Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, remains effective and continues to provide the United States a security interest in property involved in the Holcomb Expansion Project.

56.     The Consolidated Mortgage, Security Agreement and Financing Statement dated as of April 22, 2004, and the Supplement to Consolidated Mortgage, Security Agreement, and Financing Statement, dated as of July 26, 2007, remain effective and continue to provide the United States a security interest in Holcomb I and in property involved in the Holcomb Expansion Project.

57.     Mortgages, and, on information and belief, other loan documents, including loan agreements, executed and delivered by Old Sunflower and Sunflower to the United States, provide the United States substantial control over the conduct of Sunflower's business and the use of Sunflower's property.  On information and belief, the documents providing such control include the Consolidated Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, Consolidated Mortgage, Security Agreement and Financing Statement dated as of April 22, 2004, and the Supplement to Consolidated Mortgage, Security Agreement, and Financing Statement dated as of July 26, 2007.

58.     The Security Agreement and Financing Statement dated as of April 22, 2004 requires the United States to provide written consent before Sunflower may:

      a.        construct, make, lease, purchase or otherwise acquire any extensions or additions to its electric generation and transmission system, or enter into any contract therefore;

      b.        enter into any contract for the operation or maintenance of all or any part of its property;

      c.        enter into any contract for the purchase of electric power or energy;

      d.        enter into any contract for the sale for resale or sale to the ultimate consumer of electric power and energy;

      e.        enter into any contract for any transmission, interconnection or pooling arrangements; or

      f.        enter into any contract for the use by others of any of its property.

59.      The Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, imposes requirements that are virtually identical, except that they do not apply to sales of electric power and energy that does not exceed 1,000 kilowatts.

60.      The Mortgage, Security Agreement and Financing Statement dated as of May 5, 1988, and the Security Agreement and Financing Statement dated as of April 22, 2004, also provide, among other things:

      a.        subject to contingencies beyond its reasonable control, mortgagor shall at all times keep its plant and properties in necessary continuous operating condition and use all reasonable diligence to furnish the customers served by it with an adequate supply of electric energy;

      b.        Mortgagor shall not pay its directors any salaries for their services except as approved by the Government;

c.      Mortgagor shall not hire a general manager without the approval of the

Government;

d.      Mortgagor may not make certain types of investments without the approval of the

Government.

61.      Section 907 of the Rural Electrification Act, 7 U.S.C. § 907, prohibits any

borrower of funds under Section 904 of the Act, without the approval of the Secretary of

Agriculture, from selling or disposing of its property, rights, or franchises, acquired under the

provisions of the Act, until any loan from the Rural Electrification Administration, including all

interest and charges shall have been repaid.

62.      On information and belief, Sunflower is a borrower of funds under Section 904 of

the Rural Electrification Act, due to it being either a direct borrower or due to its assumption of

obligations to repay loans made to Old Sunflower.

63.      On information and belief, Old Sunflower is a borrower of funds under Section

904 of the Rural Electrification Act.

64.      On information and belief, loans obtained from the Rural Electrification

Administration or RUS to Sunflower have not been fully repaid within the meaning of 7 U.S.C. §

907.

65.      On information and belief, loans from the Rural Electrification Administration or

RUS to Old Sunflower have not been fully repaid within the meaning of 7 U.S.C. § 907.

**RUS' Approval of the Holcomb Expansion Project**

66.      Sunflower is moving forward to implement the Holcomb Expansion Project,

which includes up to three new coal-fired electric-generating units.

15

67.     The Holcomb Expansion Project also includes the expansion of an existing landfill that would allow for disposal of coal combustion wastes from the new coal-fired electric-generating units.

68.     The coal combustion wastes are to be disposed of in an unlined landfill above the Ogallala aquifer.

69.     The Ogallala aquifer is the region's primary source of water for drinking and other purposes.

70.     Electric power from the new coal-fired electric generating units is to be transmitted to customers by a number of transmission lines, including the proposed Eastern Plains Transmission Project.

71.     Sunflower is moving forward to implement plans for the Holcomb Expansion Project in collaboration with Tri-State Generation & Transmission Association, Inc. ("Tri-State"), Golden Spread Generation & Transmission Association, Inc. ("Golden Spread"), and Midwest Energy, Inc. ("Midwest Energy").

72.     Tri-State is an electric generation and transmission corporation that provides electric power to 44 electric cooperatives located in Colorado, New Mexico, Wyoming and Nebraska.

73.     Golden Spread is an electric generation and transmission corporation that provides electric power to 16 electric cooperatives located in Oklahoma and Texas.

74.     Midwest Energy is an electric and natural gas utility with operations in Western and Central Kansas.

75.     One of the proposed new coal-fired electric-generating units, known as "SF-2" or the "Eastern Unit," would be owned by Sunflower, Golden Spread, and Midwest Energy, and, on information and belief, one or more private investors.

76.     The other two proposed new coal-fired electric-generating units, known as TS-1 and TS-2, would be owned by Tri-State.

77.      Sunflower would operate all of the new units.

78.     Tri-State intends to transmit power from the coal-fired electric generating units that it acquires via the proposed Eastern Plains Transmission Project to Colorado, where connection would be made to Tri-State's existing electric transmission and generating facilities.

79.     On or about September 12, 2006, Sunflower requested the consent of RUS to proceed with execution of a number of business agreements that are required for construction of the Holcomb Expansion Project, including:

a.      A Purchase Option and Development Agreement by and among Sunflower, SEHI, Holcomb 2, LLC, HCF, and Tri-State ("Purchase Option and Development Agreement");

b.      A TS1 Site Lease Agreement by and between HCF and Tri-State;

c.      A TS2 Site Lease Agreement by and between HCF and Tri-State;

d.      An Access Easement Agreement by and among HCF, Sunflower, SEHI, and Tri-State;

e.      A letter of intent between Sunflower and Golden Spread; and

f.      A letter of intent between Sunflower and Midwest Energy.

17

80.     The Purchase Option and Development Agreement conveys to Tri-State an option to develop, build and own two pulverized coal-fired electric generating units, TS-1 and TS-2, as part of the Holcomb Expansion Project.

81.     The TS1 Site and TS2 Site Lease Agreements lease to Tri-State and convey to Tri-State an option to purchase the sites on which Tri-State proposes to build its coal-fired electric-generating units, TS-1 and TS-2.

82.     The Access Easement Agreement grants Tri-State an access easement over property owned by HCF, Sunflower and SEHI, for use in accessing the properties that are the subject of the TS1 Site and TS-2 Site Lease Agreements.

83.     The Letter of Intent between Sunflower and Golden Spread sets forth the parties' mutual understanding regarding Golden Spread's purchase of a 57.17% interest in the development, construction and operation of the Eastern Unit.

84.     The Letter of Intent between Sunflower and Midwest Energy sets forth the parties' mutual understanding regarding Midwest Energy's purchase of a 10.71% interest in the development, construction and operation of the Eastern Unit.

85.     On or about September 12, 2006, Sunflower also requested RUS's agreement to enter into a Subordination and Non-Disturbance Agreement with Tri-State and other Sunflower lenders, so that if RUS or another Sunflower lender forecloses its security interest, Tri-State's interests in developing TS-1 and TS-2 would not be affected.

86.     On information and belief, the transactions for which Sunflower sought RUS approval in connection with either the Holcomb Expansion Project or the 1982 restructuring, or

18

both sets of transactions, include the sale or disposition of property, rights or franchises acquired under the provisions of the Rural Electrification Act.

87.     On or about July 26, 2007 RUS provided Sunflower consent to enter into a number of agreements required for construction of the Holcomb Expansion Project to proceed, including the Purchase Option and Development Agreement, TS1 Site and TS2 Site Lease Agreements, Access Easement Agreement, and Subordination, Non-Disturbance and Attornment Agreements for TS1 and TS2.

88.     On information and belief, the Subordination, Non-Disturbance and Attornment Agreements prevent RUS's security interests under its mortgages from attaching to the new coal units to be constructed by Tri-State on the leased sites.

89.     In addition to approving the Project, the United States, through RUS, retains continuing control over the Project.

90.     The United States has a financial interest in the construction and operation of the Project.

### RUS' Failure to Comply With NEPA

91.     RUS did not prepare an environmental impact statement or otherwise comply with NEPA before the July 26, 2007 approvals described above, its agreement to release or modify its security interests, its approval of the 2002 restructuring, and, on information and belief, other approvals related to the Project that it has made, all of which are required for construction of the Holcomb Expansion Project to proceed.

92.     RUS failed to comply with NEPA, which requires, among other things, consideration of alternatives to a proposed project, despite the fact that the Rural Electrification

Act authorizes RUS to provide financing for alternatives to coal plants, including demand-side

management, energy conservation programs, and on and off-grid renewable energy systems,

93.     The Holcomb Expansion Project will have significant effects on the quality of the

human environment.  The Holcomb Expansion Project is one of the most controversial issues

facing Kansas.

94.      The Project's new coal-fired electric-generating units will emit massive amounts

of carbon dioxide, contributing to global warming and its devastating consequences, as well as

other air pollutants, including fine particulates and sulfur dioxide, which are also harmful to

human health and the environment.

95.     The Project's landfill expansion presents the potential for release of toxic metals

to the Ogallala aquifer.

96.     The Project will use water from the Ogallala aquifer, contributing to drawdown of

the aquifer on which the economy and well-being of the area depend.

97.     The Project's construction will foreclose opportunities to provide Western Kansas

the development benefits of clean energy alternatives, including wind power.

**<u>CLAIM FOR RELIEF</u>**

98.     The Sierra Club restates and incorporates by reference herein the allegations of

Paragraphs 1 - 97, set forth above.

99.     Action undertaken by RUS, which was required for construction of the Holcomb

Expansion Project to proceed, including RUS' approval of the agreements relating to the Project

described above, its approval of the 1982 restructuring, and its agreement to release or modify

security interests in property involved in the Project, is a major federal action significantly

affecting the quality of the human environment within the meaning of NEPA.  42 U.S.C. § 4332(2)(C).

100.     RUS has not prepared an environmental impact statement or other adequate environmental analysis in accordance with NEPA before undertaking such major federal action. RUS' undertaking of such action without complying with NEPA is arbitrary and capricious, an abuse of discretion, not in accordance with law and without observance of law within the meaning of the Administrative Procedure Act.  5 U.S.C. § 706(2).  RUS' failure to comply with NEPA is also agency action unlawfully withheld or unreasonably delayed within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against all Defendants and provide the following relief:

1.     Declare that Defendants violated NEPA by approving the Holcomb Expansion Project through undertaking the actions described above without preparing an EIS or otherwise conducting adequate environmental analysis;

2.     Order, through an injunction, the Defendants to rescind their approvals of agreements required for construction of the Holcomb Expansion Project to proceed;

3.     Order, through an injunction, the Defendants to comply with NEPA by preparing an EIS or otherwise analyzing and disclosing to the public all environmental impacts of the Holcomb Expansion Project and all reasonable alternatives to the Project before undertaking any action, including the approval of any agreement or the release of any security interest required for construction of the Project to proceed;

4.     Award Plaintiff its costs and expenses, including reasonable attorneys' fees; and

5.     Award Plaintiff such other and further relief as the Court deems just and proper.

Dated this 16th day of October, 2007.

David S. Baron
DC Bar # 464222
Earthjustice
1625 Massachusetts Ave., NW
Ste. 702
Washington, DC 20036
Tel: (202) 667-4500
Fax: (202) 667-2356
Email: dbaron@earthjustice.org

Nicholas F. Persampieri
NM Bar # 3209
CO Bar # 37802
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO 80202
Tel: (303) 623-9466
Fax: (303) 623-8083
Email: npersampieri@earthjustice.org

Attorneys for Plaintiff Sierra Club

# Greenwire
**THE LEADER IN ENERGY & ENVIRONMENTAL POLICY NEWS**

## 7. COAL: Enviro groups battle new plants with legal pressure *(04/14/2008)*

Each new coal-fired power plant proposed in the United States is assigned a Sierra Club or allied environmental organization lawyer to fight it, by any bureaucratic or legal means necessary.

The plant-by-plant campaign by the environmentalists is an effort to force the federal government to deal with climate change by fighting the plants on the local and state levels.

The campaign has achieved about 65 victories in the past three years, according to the environmental coalition -- including the Sierra Club, Natural Resources Defense Council, Environmental Defense Fund and Environmental Integrity Project -- and is coordinating opposition to about 50 additional power plant proposals.

"We hope to clog up the system," said David Bookbinder, the Sierra Club's chief climate counsel. "It's putting pressure on Congress to put together a comprehensive plan."

The campaign has infuriated utilities. They say the environmentalists' tactics are an abuse of regulatory and judicial systems and are counterpunching with ads, lobbying and court briefs of their own.

Opponents to the campaign deny the groups' allegation of 65 victories.

Jeff Holmstead, a former U.S. EPA official who is now an industry lobbyist, said the groups have been successful in stopping some coal projects, but that the number is "nowhere near" 65 (Judy Pasternak, *Los Angeles Times*, April 14). -- KJH

Advertisement

A Conundrum:                              *Meeting growing deman*

 PUBLISHING, LLC
www.eenews.net

**ClimateWire**   **ENVIRONMENT & ENERGY DAILY**   **Greenwire**   **Land Letter**   **E&ENEWS PM**   **E&ET**

*The Premier Information Source for Professionals Who Track Environmental and Energy Policy.*

© 1996-2008 E&E Publishing, LLC  Privacy Policy  Site Map

Toth Decl. Attach. 3