1  TIMOTHY J. HAGERTY
   (Kentucky State Bar No. 85414)
2  *Pro hac vice application pending*
   Frost Brown Todd LLC
3  400 W. Market St., 32nd Floor
   Louisville, Kentucky 40202
4  Telephone: (502) 589-5400
   Facsimile: (502) 581-1087
5  Email: thagerty@fbtlaw.com

6  KENNETH A. REICH
   (Massachusetts State Bar No. BBO 549464)
7  *Pro hac vice application pending*
   WolfBlock LLP
8  One Boston Place
   Boston, MA 02108
9  Telephone: (617) 226-4003
   Facsimile: (617) 226-4500
10 Email: kreich@wolfblock.com

11 JOSE R. ALLEN (California State Bar No. 122742)
   Skadden, Arps, Slate, Meagher & Flom LLP
12 Four Embarcadero Center, Suite 3800
   San Francisco, CA 94111
13 Telephone: (415) 984-6400
   Facsimile: (415) 984-2698
14 Email: Jose.Allen@skadden.com

15 Attorneys for Applicant Intervenor-Defendant
   East Kentucky Power Cooperative, Inc.

16

17              UNITED STATES DISTRICT COURT

18              NORTHERN DISTRICT OF CALIFORNIA

19                SAN FRANCISCO DIVISION

20 | CENTER FOR BIOLOGICAL DIVERSITY, KENTUCKY ENVIRONMENTAL | Case No. C 08-1240-MMC |
21 | FOUNDATION, and SIERRA CLUB | **EAST KENTUCKY POWER COOPERATIVE, INC.'S NOTICE OF** |
22 | Plaintiffs, | **MOTION AND MOTION TO INTERVENE AND MEMORANDUM OF** |
23 | vs. | **POINTS AND AUTHORITIES** |
24 | RURAL UTILITIES SERVICES, a federal agency Within the United States Department of Agriculture | Date: June 27, 2008 Time: 9:00 a.m. |
25 | Defendant. | Honorable Maxine M. Chesney Courtroom 7, 19th Floor |

26

27

28

1

**NOTICE OF MOTION AND MOTION TO INTERVENE**

2       PLEASE TAKE NOTICE that on June 27, 2008, at 9:00 a.m., or as soon thereafter as the

3   matter may be heard, in the Courtroom of Judge Maxine M. Chesney of the above-captioned Court,

4   located at 450 Golden Gate Avenue, San Francisco, CA 94102,  East Kentucky Power Cooperative,

5   Inc., will move this Court, pursuant to Rule 24 of the Federal Rules of Civil Procedure, for an order

6   allowing East Kentucky Power Cooperative, Inc. ("EKPC"), to intervene as a party defendant in this

7   action.

8       The basis for this motion is that EKPC has a significantly protectable interest that may as a

9   practical matter be impaired or impeded by the disposition of this action.  The interest of EKPC is

10  different from, and cannot be adequately represented by, Defendant Rural Utilities Service ("RUS").

11  In addition, there are common questions of law and fact between the claims and defenses of EKPC

12  and the main action, and EKPC's participation will contribute to the equitable resolution of the case.

13  The motion will be based on the following Memorandum of Points and Authorities, the Declaration

14  of Robert Marshall ("Marshall Declaration") and its attachments, and upon such further evidence

15  and oral argument as may be presented at the hearing.  Counsel for EKPC has conferred with

16  counsel for Plaintiffs, who oppose this motion, and counsel for RUS, who neither supports nor

17  opposes this motion.

18

**MEMORANDUM OF POINTS AND AUTHORITIES**

19

**INTRODUCTION**

20      East Kentucky Power Cooperative, Inc. ("EKPC"), submits this Memorandum of Points and

21  Authorities in support of its Motion to Intervene as a party defendant, pursuant to Federal Rule of

22  Civil Procedure ("Rule") 24.

23      This action was filed by the Center for Biological Diversity, Kentucky Environmental

24  Foundation and Sierra Club (collectively, the "Plaintiffs") against the Rural Utilities Service

25  ("RUS").  The Plaintiffs allege that RUS violated the National Environmental Policy Act ("NEPA"),

26  42 U.S.C. §§ 4321 *et seq.*, and its implementing regulations, 40 C.F.R. parts 1500-1508, in the

27  preparation and issuance of an Environmental Assessment ("EA") and Finding of No Significant

28  Impact ("FONSI") for EKPC's request for financing assistance from RUS for a proposed electric

generation and transmission project in Kentucky. Complaint ¶¶ 1-3. The Complaint seeks a declaration that RUS failed to comply with NEPA and an injunction preventing RUS from undertaking activities to support EKPC's proposed project until RUS has complied with NEPA and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). Complaint ¶ 5.

Through this motion, EKPC seeks to intervene in this action as a matter of right under Rule 24(a)(2). Alternatively, EKPC seeks permissive intervention under Rule 24(b)(1)(B). EKPC satisfies all the requirements for intervention under Rule 24. First, EKPC's motion to intervene is timely. Second, EKPC has a direct and substantial interest relating to the subject matter of this action, and as a practical matter, disposition of this action may impair or impede EKPC's ability to protect its interest. Indeed, EKPC is the "real" party in interest in this case. Finally, no other party in this action can adequately represent EKPC's interest. Moreover, the claims and defenses to be asserted by EKPC share common questions of law and fact with the main action, and EKPC's participation will contribute to the equitable resolution of this case. For the foregoing reasons, and as more fully set forth below, EKPC's motion to intervene should be granted.

## FACTUAL BACKGROUND

EKPC is a non-profit electric generation and transmission cooperative headquartered in Winchester, Kentucky. EKPC provides electric power through 16 locally-based, consumer-owned electric distribution cooperatives to over 511,000 residences and businesses and more than 1,000,000 individuals in 87 counties throughout central and eastern Kentucky. Marshall Decl. ¶ 3. As an electric cooperative organized and existing under Chapter 279 of the Kentucky Revised Statutes, EKPC is required to provide adequate electric service to all members of the public located within the certified service territories of its member distribution cooperatives. *See id.* ¶ 4.

EKPC has requested financing assistance from RUS, an agency that administers the U.S. Department of Agriculture's Rural Development Programs ("USDA Rural Development "), for the installation and construction of two new natural gas-fired combustion turbine electric generating units ("CTs") at EKPC's J.K. Smith Electric Generating Station ("Smith Station"), two new electric switching stations, and a 36-mile, 345 kilovolt electric transmission line extending from the Smith Station through Clark, Madison, and Garrard Counties, Kentucky (the "Project"). 72 Fed. Reg.

53526 (Sept. 19, 2007).  In June 2007, RUS published a notice of availability of an Environmental Assessment ("EA"), prepared pursuant to NEPA, for RUS's possible financing assistance to EKPC for the Project.  72 Fed. Reg. 35031 (June 26, 2007).  After receiving public comments on the EA, including comments from the Plaintiffs, RUS published a Finding of No Significant Impact ("FONSI") related to EKPC's request for financing assistance for the Project in the Federal Register on September 19, 2007.  72 Fed. Reg. 53526.

The proposed new CTs are needed to provide additional electric generating capacity that would allow EKPC to meet its projected electrical peaking demand in the 2009-2011 time period. *Id.*  The proposed new transmission and switching station facilities are necessary to provide an outlet for the additional electric power that would be generated by the new CTs.  *Id.*  The transmission lines servicing the Smith Station are currently at maximum capacity and are incapable of delivering the additional electric power to be generated by the CTs proposed at the Smith Station.  Marshall Decl. ¶ 7.  Timely construction and operation of the proposed electric generation and transmission facilities are essential in order for EKPC to satisfy its statutory obligations to the public and to meet the growth in electrical peaking demand projected by 2009-2011.  *See id.* ¶¶ 6-8.

The public necessity for the CTs, transmission line, and switching facilities proposed by EKPC has been confirmed in three separate orders of the Kentucky Public Service Commission ("PSC").  Pursuant to KRS 278.020, a Kentucky regulated utility, such as EKPC, may not construct the sort of generation and transmission facilities at issue in this action without a certification from the Kentucky PSC that "public convenience and necessity require the service or construction." Upon the application of EKPC, and after a full evidentiary hearing, the Kentucky PSC issued an Order granting a Certificate of Public Convenience and Necessity ("CPCN") to EKPC for the construction of the proposed CTs on August 29, 2006.  *See* Marshall Decl., Attach. 1 (KY PSC Order, Case No. 2005-00053).  The issuance of that CPCN was confirmed in a subsequent Order of the Kentucky PSC issued on May 11, 2007.  *See* Marshall Decl., Attach. 2 (KY PSC Order, Case No. 2006-00564).  Both of those orders were available to and reviewed by RUS prior to the issuance of the FONSI.  Marshall Decl. ¶ 13.  In those orders, the Kentucky PSC found that the proposed CTs were the "best, least-cost options" to provide the peaking generation capacity to meet the projected

1    demands of EKPC's existing distribution cooperative members.  Marshall Decl., Attach. 1 at 9.

2    Moreover, the Kentucky PSC concluded that any delay in the construction of the two proposed CTs

3    "will result in substantial contractual penalties and inhibit EKPC from more efficiently and

4    economically dispatching its generation units."  Marshall Decl., Attach. 2 at 12.

5         Similarly, the Kentucky PSC issued an Order on September 19, 2007, granting a CPCN to

6    EKPC for the construction of the proposed 345 kilovolt transmission line included in RUS's EA and

7    FONSI.  *See* Marshall Decl., Attach. 3 (KY PSC Order, Case No. 2006-00463).  In that Order, the

8    Kentucky PSC found that the "proposed 345 kV transmission line is necessary and reasonable and

9    that its construction will not result in the wasteful duplication of facilities."  Marshall Decl., Attach.

10   3 at 10.  Thus, the Kentucky PSC has certified the public necessity of EKPC's proposed Project.

11        The relief sought by the Plaintiffs will have a direct and potentially devastating impact on the

12   ability of EKPC to meet the demonstrated electric power needs of its customers in a timely and cost-

13   effective manner.  Any significant delay in the implementation of this essential Project will

14   significantly impair EKPC's ability to provide an adequate power supply to its customers during

15   times of peak demand, starting as early as 2009.  Marshall Decl. ¶ 8.  Such a failure could lead to

16   electrical brownouts and extended electrical outages for electric consumers within EKPC's service

17   area, in violation of EKPC's statutory duties.  *See id.*

18        This memorandum demonstrates that EKPC meets the requirements for intervention as a

19   matter of right pursuant to Rule 24(a)(2) and should be accorded intervenor status to the fullest

20   extent allowed by applicable law.  Alternatively, EKPC requests that this Court allow EKPC to

21   intervene fully in this action as a matter of judicial discretion under Rule 24(b)(1)(B).

22                              **ARGUMENT**

23   **I.    EKPC should be granted leave to intervene as a matter of right pursuant to Rule 24(a).**

24        EKPC fully meets the requirements for mandatory intervention set forth in Rule 24(a), and

25   therefore should be granted full intervenor status in this action.  As a general rule, an applicant

26   intervenor must meet four requirements to satisfy Rule 24(a):  "(1) the motion must be timely; (2)

27   the applicant must assert a 'significantly protectable' interest relating to property or a transaction that

28   is the subject matter of litigation; (3) the applicant must be situated so that disposition of action may

Motion to Intervene of East Kentucky Power Cooperative, Inc.                    Page 4
Case No. C08-1240-EMC

1  as a practical matter impair or impede the interest; and (4) the applicant's interest must be

2  inadequately represented by the parties." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094,

3  1107-08 (9th Cir. 2002).   The following sections apply these criteria and explain the basis for

4  EKPC's intervention request.

5        EKPC acknowledges that the Ninth Circuit typically limits the scope of intervention as a

6  matter of right for private parties in NEPA actions to the remedy phase of the case. *See Kootenai*

7  *Tribe of Idaho*, 313 F.3d at 1108.  Nevertheless, EKPC respectfully requests that this Court carefully

8  consider the applicability of that rule to this case in light of the potential significant implications in

9  not allowing EKPC to intervene on the merits in this action.[1]

10       **A.     EKPC's motion to intervene is timely.**

11       EKPC's motion is timely because this action is still in its initial stages.  "In determining

12 whether a motion for intervention is timely, we consider three factors:  '(1) the stage of the

13 proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the

14 reason for and length of delay.'" *League of United Latin American Citizens v. Wilson*, 131 F.3d

15 1297, 1302 (9th Cir. 1997) (quoting *County of Orange v. Air California*, 799 F.2d 535, 537 (9th Cir.

16 1986)).

17       This action is in its very earliest stages.  The Plaintiffs filed their Complaint on March 3,

18 2008.   RUS filed its Answer on May 2, 2008.  On May 7, 2008, RUS filed an amended motion to

19 transfer this action to the United States District Court for the District of Columbia or, alternatively,

20 to the Eastern District of Kentucky.  This Court has not yet ruled on RUS's motion, which is set for

21 hearing on June 27, 2008.  A case management conference is set for July 18, 2008.  No other

22 motions have been filed, and there have been no other significant procedural developments.  EKPC

23 is prepared to join these proceedings promptly and to be bound by any scheduling orders or other

24 substantive or procedural orders issued by this Court prior to an order granting intervention.

25

26 _____

[1] EKPC notes that other federal circuits to have considered the question of intervention as a matter of
right in the NEPA context have recognized the importance of the full participation of intervenor-
27 defendants in NEPA actions and have applied a more liberal interpretation of Rule 24(a).  *See, e.g.,*
*Kleissler v. U.S. Forest Service*, 157 F.3d 964, 971 (3d Cir. 1998); *Sierra Club v. Espy*, 18 F.3d
28 1202, 1207 (5th Cir. 1994); *Wilderness Soc'y v. Babbitt,* 104 F. Supp. 2d 10, 18 (D.D.C. 2000).

1   Accordingly, granting the motion would not in any way delay or impede the proceedings, or result in

2   prejudice to or place additional burdens on the existing parties. *See* 7A Wright & Miller, *Federal*

3   *Practice and Procedure* § 1916 ("[I]f the intervention will not delay the termination of the litigation

4   intervention ordinarily will be allowed."). There can be no dispute that EKPC's motion is timely.

5       **B.     EKPC has a significantly protectable interest relating to the subject matter of**

6              **this action, and, as a practical matter, disposition of this action may impair or**

7              **impede EKPC's ability to protect its interest.**

8       An applicant intervenor has a "significantly protectable" interest in an action if "(1) they

9   assert an interest that is protected under some law and (2) there is a relationship between the legally

10  protected interest and the plaintiff's claims." *Center for Biological Diversity v. U.S. Fish and*

11  *Wildlife Service*, 2005 U.S. Dist. Lexis 42275, *12 (N.D. Cal. 2005). "Applicants who have an

12  existing legal right, contract or permit have a legally protectable interest." *Id.* In this case, EKPC

13  has a significant, existing legal interest in RUS's decision to provide financing assistance for

14  EKPC's Project. The relief requested by Plaintiffs would substantially impair that interest and may

15  prevent EKPC from meeting its statutory obligation to provide adequate electric service to its

16  members during times of peak demand in 2009-2011.[2]

17      EKPC's legally protectable interest goes well beyond potential economic losses to EKPC as

18  a company. As noted previously, EKPC is a non-profit electric generation and transmission

19  cooperative with a statutory, as well as contractual, obligation to provide adequate and reliable

20  electric service to *members of the public* within the certified service areas of its member distribution

21  cooperatives. Marshall Decl. ¶ 4. The construction of the proposed Project is needed to allow

22  EKPC to meet that obligation during times of peak electrical demand, beginning as soon as 2009.

23  *Id.* ¶ 6. EKPC's analysis of its projected load requirements, as documented in the EA, demonstrates

24  that additional electric generation and transmission is required to avoid brownouts and power

25

26  [2] Unlike the intervenors in *Center for Biological Diversity*, EKPC does not base its request for
    intervention on speculative harms to unparticularized interests as the result of the promulgation of a
27  general rule, but instead seeks to protect a particular, concrete, legally protected interest (i.e.,
    financing assistance for a needed electric power project) that would be directly impaired by the relief
28  requested by Plaintiffs.

1   interruptions caused by insufficient generation or transmission system overloads. *Id.* ¶ 8. The need

2   for additional generation and transmission facilities to satisfy the projected peaking demand of

3   EKPC's customers by 2009 has been confirmed by the Kentucky PSC, which has issued Certificates

4   of Public Convenience and Necessity for both the generation and transmission components of the

5   Project. *See id.* ¶¶ 9-12. If adequate generation is not available, EKPC's electrical consumers will

6   eventually start experiencing a deterioration of electric service as the electrical peak load on the

7   system grows. *Id.* ¶ 8. If Plaintiffs prevail in this action, RUS's financial assistance for the Project

8   will be halted. The required peaking generation may not be available when needed, resulting in

9   significant, concrete harm to EKPC and the members of the public within its service area.

10      There is a direct relationship between EKPC's legally protectable interest and the Plaintiffs'

11  claims. In essence, the Plaintiffs allege that RUS failed to comply with NEPA when it issued the EA

12  and FONSI. If the Plaintiffs prevail, RUS will be unable to provide financing assistance to allow

13  EKPC to construct the Project in a timely manner. If the Project is not completed when needed,

14  EKPC will be unable to provide adequate and reliable electric power to EKPC's customers.

15      It is important to note that EKPC and RUS engaged in a long, meticulous, and collaborative

16  environmental review process to evaluate the potential environmental impacts of RUS's financial

17  assistance for the proposed Project. *See id.* ¶¶ 15-17. While RUS engaged in a thorough and

18  independent review of the information and analysis in the EA, EKPC provided substantial assistance

19  to RUS in gathering that information and commissioning the expert environmental reports relied

20  upon by RUS in making its decision. *Id.* ¶ 15. *See* 40 C.F.R. § 1506.5(b); 7 C.F.R. §§ 1794.10,

21  1794.41 (regulations allowing reliance on private applicant's consultant, subject to oversight and

22  independent review of RUS). EKPC also provided detailed information to RUS regarding the need

23  for additional peaking generation, the alternatives evaluated, and the specific design elements of the

24  proposed Project. *Id.* ¶ 16. Thus, EKPC provided substantial experience and expertise in assisting

25  RUS with its NEPA compliance obligations and can provide substantive relevant input to assist this

26  Court in evaluating the merits of the Plaintiffs' NEPA claims.

27      Based on the foregoing reasons, it is clear that EKPC has a significant protectable interest in

28  the subject matter of this action, and a determination that RUS failed to comply with NEPA will

1   substantially impair EKPC's ability to satisfy its contractual and statutory obligations to the

2   members of the public in its service area.

3         **C.    EKPC's interest is not adequately represented by the parties to the action.**

4         RUS cannot adequately represent the interests of EKPC.  In this action, the interests of RUS

5   are not necessarily the same as the interests of EKPC.  RUS's interest in this action is to uphold the

6   integrity of its administration of the USDA Rural Development program and its application of the

7   NEPA process.  RUS is charged with providing financing, under the Rural Electrification Act of

8   1936, to upgrade, maintain and expand America's rural electrical infrastructure.

9         EKPC has a statutory and contractual obligation to satisfy the current and future electric

10  power needs of over 511,000 residences and businesses and over 1,000,000 individuals across

11  eastern and central Kentucky.  RUS has no such obligation.  If RUS were enjoined from financing

12  this particular project, its loan program would continue, whereas such an injunction would directly

13  and substantially interfere with EKPC's legal, statutory and Kentucky PSC-ordered requirement to

14  serve its members with electric power.  Because EKPC's interests may significantly diverge from

15  those of RUS on numerous issues, RUS therefore cannot be expected to adequately represent the

16  interests of EKPC in this action.  Furthermore, a resolution of this matter by settlement among the

17  Plaintiffs and RUS would not necessarily reflect the interests of EKPC and its members.

18        Accordingly, EKPC has satisfied the requirements of Rule 24(a).  Its motion is timely and

19  demonstrates that EKPC has a significant protectable interest that is not adequately represented in

20  the action.  For these reasons, EKPC respectfully requests that it be allowed to intervene fully in this

21  action as a matter of right.

22  **II.    Alternatively, EKPC should be allowed to intervene as a matter of judicial**

23  **discretion under Rule 24(b)(1)(B).**

24        Under Rule 24(b), intervention may be permitted if "(1) the application is timely and (2) the

25  claim or defense and the main action have a question of law or fact in common."  *Center for*

26  *Biological Diversity* at *7.  "[T]he Ninth Circuit has held that a party may be allowed to

27  permissively intervene in a NEPA action."  *Id*. at *8 (citing *Kootenai Tribe of Idaho*, 313 F.3d at

28  1111).  As demonstrated in Section I.A. above, EKPC's motion to intervene is timely and will not

1   prejudice the rights of the parties or cause undue delay.

2       The Ninth Circuit has noted that, "[u]nlike Rule 24(a), a 'significant protectable interest' is

3   not required by Rule 24(b) for intervention; all that is necessary for permissive intervention is that

4   intervenor's 'claim or defense and the main action have a question of law or fact in common.'"

5   *Kootenai Tribe of Idaho*, 313 F.3d at 1108 (quoting Rule 24(b)).[3]   There are clearly common

6   questions of law and fact between the main action and the claims and defenses asserted by EKPC.

7   EKPC intends to assert defenses of RUS's decision regarding financing assistance for the proposed

8   Project that are directly responsive to Plaintiffs' claims for declaratory and injunctive relief.  *See*

9   *Kootenai Tribe of Idaho*, 313 F.3d at 1110 (permissive intervention granted where intervenors

10  asserted defenses "directly responsive to the claim for injunction").  As described in greater detail in

11  Section I.B. above, EKPC and its members have a substantial, concrete interest in RUS's financing

12  decision and in the timely construction of the Project.  *See id.* at 1110-11 (permissive intervention

13  granted where applicants had interest in use and enjoyment of roads and areas subject to challenged

14  rule); *Center for Biological Diversity* at *17-18 (permissive intervention granted where applicant

15  asserted "an interest in the use of land regulated by the [challenged rules]").  Without financing

16  assistance from RUS, EKPC will be seriously hindered in its ability to construct the Project, meet its

17  projected electrical peaking demand beginning in 2009, and satisfy its contractual and statutory

18  obligations.

19      EKPC's participation will also contribute to the equitable resolution of this case.  Unlike a

20  challenge to a general rule or regulation, the decision that is the subject of this action affects only

21  one entity – EKPC – and only one project – the proposal to construct new electric generation and

22  transmission facilities to meet projected peaking demand in the 2009-2011 period.  By allowing

23  EKPC permissive intervention, this Court will facilitate a full hearing of the issues and afford EKPC

24  the right to defend its significant interest in RUS's financing decision, including the right to appeal

25

26  [3] The *Kootenai* court, explaining the liberal nature of intervention under Rule 24(b), notes with
    approval a passage from a leading treatise, which states, *inter alia*, that "it appears that the

27  intervenor-by-permission does not even have to be a person who would have been a proper party at
    the beginning of the suit." 313 F.3d at 1108 (quoting 7C Wright, Miller & Kane, Federal Practice

28  and Procedure § 1911, 357-63 (2d ed. 1986)).

1   any adverse decision of this Court.  *See Kootenai Tribe of Idaho*, 313 F.3d at 1111 (permissive

2   intervention would contribute to equitable resolution of the case; presence of intervenors would

3   assist court in orderly procedures leading to resolution of case); *Center for Biological Diversity* at

4   *18 (permissive intervention will contribute to equitable resolution of the case and best protect

5   applicant intervenors' rights, including appeal rights).   Without intervention, EKPC would be

6   substantially prevented from defending its vital interests in this action.

7       For the foregoing reasons, EKPC respectfully requests that the Court exercise its discretion

8   and grant EKPC permissive intervention to participate fully as a party defendant in this action.

9                                           **CONCLUSION**

10      Accordingly, East Kentucky Power Cooperative, Inc. respectfully requests that the Court

11  grant its motion to intervene pursuant to Federal Rule of Civil Procedure 24.

12  Dated:  May 30, 2008                              Respectfully submitted,

13

14                                            _____S/ JOSÉ R. ALLEN_____
                                              JOSE R. ALLEN
15                                            Skadden, Arps, Slate, Meagher & Flom LLP
                                              Four Embarcadero Center, Suite 3800
16                                            San Francisco, California 94111
                                              Telephone: (415) 984-6400
17                                            Facsimile: (415) 984-2698
                                              Email: Jose.Allen@skadden.com
18
                                              TIMOTHY J. HAGERTY
19                                                   *Pro hac vice application pending*
                                              Frost Brown Todd LLC
20                                            400 W. Market St., 32nd Floor
                                              Louisville, Kentucky 40202
21                                            Telephone: (502) 589-5400
                                              Facsimile: (502) 581-1087
22                                            Email: thagerty@fbtlaw.com

23                                            KENNETH A. REICH
                                                   *Pro hac vice application pending*
24                                            WolfBlock LLP
                                              One Boston Place
25                                            Boston, MA 02108
                                              Telephone: (617) 226-4003
26                                            Facsimile: (617) 226-4500
                                              Email: kreich@wolfblock.com
27
                                              Attorneys for Applicant Intervenor-Defendant
28                                            East Kentucky Power Cooperative, Inc.

1  TIMOTHY J. HAGERTY
   (Kentucky State Bar No. 85414)
2  *Pro hac vice application pending*
   Frost Brown Todd LLC
3  400 W. Market St., 32nd Floor
   Louisville, Kentucky 40202
4  Telephone: (502) 589-5400
   Facsimile: (502) 581-1087
5  Email: thagerty@fbtlaw.com

6  KENNETH A. REICH
   (Massachusetts State Bar No. BBO 549464)
7  *Pro hac vice application pending*
   WolfBlock LLP
8  One Boston Place
   Boston, MA 02108
9  Telephone: (617) 226-4003
   Facsimile: (617) 226-4500
10 Email: kreich@wolfblock.com

11 JOSE R. ALLEN (California State Bar No. 122742)
   Skadden, Arps, Slate, Meagher & Flom LLP
12 Four Embarcadero Center, Suite 3800
   San Francisco, CA 94111
13 Telephone: (415) 984-6400
   Facsimile: (415) 984-2698
14 Email: Jose.Allen@skadden.com

15 Attorneys for Applicant Intervenor-Defendant
   East Kentucky Power Cooperative, Inc.
16

17                 UNITED STATES DISTRICT COURT

18               NORTHERN DISTRICT OF CALIFORNIA

19                   SAN FRANCISCO DIVISION

20 CENTER FOR BIOLOGICAL DIVERSITY,        Case No. C 08-1240-MMC
   KENTUCKY ENVIRONMENTAL
21 FOUNDATION, and SIERRA CLUB             **DECLARATION OF ROBERT M.**
                                           **MARSHALL IN SUPPORT OF MOTION**
22                 Plaintiffs,             **TO INTERVENE**
              vs.
23                                         Date: June 27, 2008
   RURAL UTILITIES SERVICES, a federal agency   Time: 9:00 a.m.
24 Within the United States Department of Agriculture   Honorable Maxine M. Chesney
                                           Courtroom 7, 19th Floor
25                 Defendant.

26

27              **DECLARATION OF ROBERT M. MARSHALL**

28      I, Robert M. Marshall, do hereby declare as follows:

Intervenor's Decl. of Robert M. Marshall, Case No. C08-1240-MMC

1     1.    I am the President and Chief Executive Officer of East Kentucky Power Cooperative,

2 Inc. ("EKPC"). In my capacity as President and Chief Executive Officer, I am responsible for the

3 overall management and direction of EKPC's programs and policies, under the oversight of EKPC's

4 Board of Directors. Those programs include the construction, operation and maintenance of electric

5 generation and transmission facilities to meet the electric power needs of EKPC's members and

6 customers.

7     2.    EKPC's headquarters are located at 4775 Lexington Road, Winchester, Kentucky

8 40392.

9     3.    EKPC is a non-profit electric generation and transmission cooperative headquartered

10 in Winchester, Kentucky. EKPC provides electric power through 16 locally-based, consumer-owned

11 electric distribution cooperatives to over 511,000 residences and businesses, serving over 1,000,000

12 individuals, in 87 counties in central and eastern Kentucky. EKPC is owned and governed by its 16

13 member electric distribution cooperatives, which in turn are owned and governed by the customers

14 they serve.

15     4.    EKPC's purpose, as an electric generation and transmission cooperative, is to

16 generate energy and transmit it to locally-based cooperatives that distribute it to retail customers.

17 EKPC provides wholesale energy and services to its 16 distribution cooperatives through power

18 plants, peaking units, landfill gas units, hydro power, and more than 2,800 miles of electric

19 transmission lines. As an electric cooperative organized and existing under Chapter 279 of the

20 Kentucky Revised Statutes, EKPC is required to provide adequate electric service to all members of

21 the public located within the certified service territories of its member distribution cooperatives. In

22 addition, EKPC has entered into an all-requirements wholesale power contract with each of its 16

23 member distribution cooperatives, whereby EKPC is obligated to supply all of the power needs of

24 the members of each cooperative.

25                **The Project**

26     5.    EKPC has requested financing assistance from the Rural Utilities Services ("RUS")

27 for the installation and construction of two new natural gas-fired combustion turbine electric

28 generating units ("CTs") at its J.K. Smith Electric Generating Station in Clark County, Kentucky

Intervenor's Decl. of Robert M. Marshall, Case No. C08-1240-MMC               Page 2

1   ("Smith Station"), two new 345 kilovolt electric switching stations (one in Garrard County,

2   Kentucky and the other at the Smith Station), and a 36-mile, 345 kilovolt electric transmission line

3   extending from the Smith Station through Clark, Madison, and Garrard Counties, Kentucky (the

4   "Project").

5        6.    The proposed CTs are needed to provide additional electric generating capacity to

6   allow EKPC to meet its projected electrical peaking demand in the 2009-2011 period. EKPC's load

7   forecast indicates that the total energy requirements for its system are projected to increase by 2.3

8   percent per year over the 2006 through 2026 period.    Net winter peak demand will increase by

9   approximately 1,800 megawatts, and net summer peak demand will increase by approximately 1,100

10  megawatts. Peaking generation is designed to serve electrical demand at times of heightened usage,

11  particularly during hot summer and cold winter months. (In contrast, base load generation operates

12  throughout the year and is designed to meet the average power demand on a system on a regular

13  basis.)   In the short-term, EKPC's load forecast documents the need for approximately 200

14  megawatts of additional generation capacity to meet winter peak demand in 2009-2011.

15       7.    The proposed transmission line and switching stations are needed to provide an outlet

16  for the additional electric power that will be generated at the Smith Station.   Currently, the

17  transmission lines that service the Smith Station are operating at maximum capacity and are

18  incapable of delivering the additional electric power that will be generated by the construction of the

19  proposed CTs.   Additional transmission is needed to avoid brownouts and power interruptions

20  caused by insufficient generation or transmission system overloads.

21       8.    Time is of the essence with the construction and operation of the Project. A delay in

22  the construction of the proposed Project will prevent EKPC from providing adequate electric power

23  during times of peak summer and winter demand to the over 511,000 residences and businesses, and

24  over 1,000,000 individuals, EKPC serves, beginning as early as 2009.  If that occurs, EKPC's

25  customers will eventually start experiencing electrical brownouts and extended electrical outages as

26  a result of insufficient electric generation and/or transmission system overloads.

27                        **Public Service Commission Proceedings**

28

Intervenor's Decl. of Robert M. Marshall, Case No. C08-1240-MMC                    Page 3

9.      The Kentucky Public Service Commission ("PSC") has confirmed the public necessity for EKPC's proposed Project.

10.      Pursuant to KRS 278.020, EKPC applied for authorization of the proposed Project, and the issuance of a Certificate of Public Convenience and Necessity ("CPCN"), from the Kentucky PSC.  EKPC may not construct the proposed Project without receiving a certification from the Kentucky PSC that "public convenience and necessity require the service or construction." KRS 278.020(1).

11.      After a full evidentiary hearing, the Kentucky PSC issued an Order granting a Certificate of Public Convenience and Necessity to EKPC for the proposed CTs on August 29, 2006.  KY PSC Case No. 2005-00053.  A copy of the Order is attached hereto as Attachment 1.  The need for the proposed CTs was confirmed in a subsequent Order issued by the PSC on May 11, 2007.  KY PSC Case No. 2006-00564.  A copy of the Order is attached hereto as Attachment 2.

12.      After a full evidentiary hearing, the Kentucky PSC issued an Order granting a CPCN to EKPC for the construction of the proposed 345 kilovolt transmission line on September 19, 2007.  The Order confirmed the public necessity for the proposed transmission line.  KY PSC Case No. 2006-000463.  A copy of the Order is attached hereto as Attachment 3.

13.      EKPC provided copies of the foregoing Orders of the Kentucky PSC, as well as additional documents from the Kentucky PSC record, to RUS for review and evaluation during the development of the EA and FONSI.

**Environmental Review Process**

14.      Based on EKPC's request for possible financing assistance for the Project, RUS conducted a thorough review of the Project's potential environmental effects pursuant to the National Environmental Policy Act ("NEPA").  That review culminated in the publication of an Environmental Assessment ("EA") on June 26, 2007 for RUS's possible financing assistance to EKPC for the Project.  *See* 72 Fed. Reg. 35031 (2007).  After a public comment and review period, RUS published a Finding of No Significant Impact ("FONSI") related to the environmental impacts of EKPC's request for financing assistance for the Project on September 19, 2007.  *See* 72 Fed. Reg. 53526 (2007).

15.   EKPC worked closely with RUS in a long, meticulous, and collaborative environmental review process to provide the information and analyses included in the EA and FONSI.   While RUS oversaw EKPC's work and engaged in its own independent review of the information and analyses in the EA, EKPC provided substantial assistance to RUS in gathering that information and commissioning the expert environmental reports relied on by RUS in making its decision.   That cooperation and participation is expressly authorized under federal law.   *See* 40 C.F.R. § 1506.5(b); 7 C.F.R. §§ 1794.10, 1794.41.

16.   EKPC's environmental staff has substantial expertise and experience in a wide variety of scientific disciplines and in the evaluation of the potential environmental effects of electric generation and transmission projects on the environment.   In addition to this in-house staff, EKPC retained expert consultants to prepare detailed reports on the potential effects of the proposed Project on environmental and cultural resources in the Project area, including biological resources, threatened and endangered species, and cultural historic and archaeological resources.   EKPC also retained expert consultants to assist in the identification and evaluation of potential alternatives to meet the electric generation and transmission needs identified in the EA.

17.   The extensive environmental information obtained and prepared by EKPC and its expert consultants was provided to RUS for its independent review and evaluation in the preparation and issuance of the EA and FONSI.   EKPC's expert staff will continue to coordinate closely with RUS during the implementation of the Project.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

Executed this __28__ day of May, 2008

Robert M. Marshall

ATTACHMENT 1

COMMONWEALTH OF KENTUCKY

BEFORE THE PUBLIC SERVICE COMMISSION

In the Matter of:

| | |
|---|---|
| APPLICATION OF EAST KENTUCKY POWER COOPERATIVE, INC. FOR A CERTIFICATE OF PUBLIC CONVENIENCE AND NECESSITY, AND A SITE COMPATIBILITY CERTIFICATE, FOR THE CONSTRUCTION OF A 278 MW (NOMINAL) CIRCULATING FLUIDIZED BED COAL FIRED UNIT AND FIVE 90 MW (NOMINAL) COMBUSTION TURBINES IN CLARK COUNTY, KENTUCKY | )<br>)<br>)<br>)   CASE NO.<br>)   2005-00053<br>)<br>)<br>)<br>) |

O R D E R

East Kentucky Power Cooperative, Inc. ("EKPC") filed an application on January 31, 2005 for a Certificate of Public Convenience and Necessity ("CPCN") under KRS 278.020(1), and a Certificate of Site Compatibility under KRS 278.216, to construct electric generating facilities at its J. K. Smith power station located in Clark County, Kentucky. The proposed facilities include a 278 MW circulating fluidized bed coal-fired unit ("Smith CFB") and five 90 MW combustion turbines ("Smith CTs 8-12"). The estimated installed costs are $533 million for the Smith CFB and $259.2 million for the Smith CTs 8-12. EKPC intends to finance the facilities through long-term indebtedness which will be subject to the supervision and control of the Rural Utilities Service ("RUS"), an agency of the federal government. This financing will be exempt from review by the Commission under KRS 278.300(10).

The Attorney General's Office ("AG") and Gallatin Steel Company, the largest retail customer of electricity supplied by EKPC, requested and were granted

intervention. Motions to intervene were also filed by EnviroPower, LLC, developer of a merchant power plant in Knott County, Kentucky, and by Siemens-Westinghouse Power Corporation, a manufacturer of combustion turbines. EnviroPower, LLC and Siemens-Westinghouse Power Corporation had submitted bids to supply EKPC's power supply needs, but neither bid was accepted by EKPC. Both requests to intervene were denied on the grounds that the movants did not consume power supplied by EKPC, had no interest in either the rates or service supplied by EKPC, and their only interests were as unsuccessful bidders in a private power supply solicitation. EKPC filed numerous responses to requests for information and a public hearing was held on November 29, 2005.

## BACKGROUND

EKPC is a generating and transmission cooperative which is organized under KRS Chapter 279 and currently provides service to 16 electric distribution cooperatives in Kentucky. The proposed Smith CFB unit will provide base load capacity needed to meet the growing demand of EKPC's 16-member cooperatives. The proposed CTs will provide peaking capacity and will partially replace a purchase power contract, which expired in 2005, for peaking capacity of 150 MW in the winter and 75 MW in the summer. Two of the proposed CTs will provide the future peaking requirements, including reserves, for EKPC's newest distribution cooperative member, Warren Rural Electric Cooperative Corporation ("Warren RECC"). Although Warren RECC has historically received its power supply from the Tennessee Valley Authority, Warren RECC has terminated that supply agreement effective April 2008 and has entered into a membership agreement with EKPC.

## NEED FOR ADDITIONAL GENERATION

EKPC had previously filed in April 2003 an Integrated Resource Plan ("IRP") containing 20-year forecasts of electric loads and capacity needs.[1] That IRP was based on a strategy of having firm resources to meet its summer peak while maintaining a long-term reserve margin of 12 percent. To meet its systems' winter peak, EKPC limits power purchases to the level it considers can be reliably imported, which is 300 MW to 400 MW. After reflecting the addition of the 268 MW at F.B. Gilbert Unit in April 2005, EKPC's 2003 IRP projected a need for additional base load generation of approximately 270 MW by 2011 and additional peaking generation of approximately 500 MW in the 2004 through 2009 time period.

EKPC filed an IRP Update Report which reflects recent and significant changes to both its load and resources.[2] As a result of the addition of Warren RECC as a member, EKPC's projected peak load in 2008 is approximately 433 MW higher in the winter and 400 MW higher in the summer. Allowing for a 15 percent reserve margin, EKPC determined that it needed an additional 270 MW of base load capacity and 200 MW of peaking capacity to serve Warren RECC. Revisions to the load forecast of EKPC's current 16 members show a reduction of 100 MW in the summer peak, with a slight increase in the winter peak.

EKPC's resources have also increased by the addition of two combustion turbines totaling 160 MW of peaking capacity at the Smith Station ("Smith CTs 6 and 7")

---

[1] Case No. 2003-00051, The 2003 Integrated Resource Plan of East Kentucky Power Cooperative, Inc.

[2] Application Exhibit No. 3.

and the addition of the 278 MW circulating fluidized bed coal-fired unit at its Spurlock Generating Station in Maysville, Kentucky ("Spurlock 4"). The Spurlock 4 unit, which is projected to be online in late 2008, was added specifically to meet the base load power requirements of Warren RECC, which has agreed to pay the incremental costs of the generation and transmission needed to serve its load. After reflecting these capacity additions, which have been previously approved by the Commission, EKPC's load forecast shows a base load capacity deficiency of approximately 270 MW by 2011 and a peaking capacity deficiency of approximately 440 MW by 2007 through 2008. Further analysis by EKPC shows that as a result of recent record-high natural gas prices, advancing the online date of the needed base load capacity from 2011 to 2009 will reduce the net present value cost of that unit by over $53 million.[3] Based on a review of EKPC's IRP Update Report, the Commission finds that these load projections are reasonable and they demonstrate a need for approximately 270 MW of base load generation and 440 MW of peaking generation.

## PROPOSED GENERATION PROJECT

EKPC issued RFP 2004-01 on April 2, 2004 to request proposals for base load and peaking capacity to meet the needs of current member systems and Warren RECC. EKPC hired EnerVision, Inc., an energy services consultant, to assist in the evaluation of proposals for base load and peaking capacity and to rank the proposals based on their economics. The RFP stated that the purpose of its issuance was to evaluate alternatives to EKPC's self-construct options. Over 30 power supply proposals were received and evaluated by EnerVision and EKPC. Fourteen bids for base load power

---

[3] Application Exhibit 3 at 2-3.

and five bids for peaking power were analyzed in detail, including EKPC's self-construct bids. The remaining bids were eliminated because they did not comply with the RFP or they were too highly priced.

EKPC's self-construct bids included the Smith CFB and a similar coal-fired unit known as Spurlock 5 at EKPC's H. L. Spurlock Station in Maysville, Kentucky. EnerVision's analysis shows that the Smith CFB and Spurlock 5 base load generating units were the least cost options based on a 32-year net present value analysis. The difference in economics between these two alternatives is less than one percent. The Smith CFB was selected based on the need for, and cost of, transmission facilities at the two generating stations. Constructing Spurlock 5 will necessitate an additional $41.4 million of transmission additions at the Spurlock Station, while constructing the Smith CFB will not necessitate any transmission additions other than those already underway to accommodate the additional CTs proposed in this case.

In response to EKPC's need for peaking capacity, EnerVision recommended the Siemens V84.3A gas turbines based on the results of EnerVision's economic analysis. However, EKPC did not accept that recommendation due to concerns regarding the past performance of the Siemens V84.3A turbines. Based on discussions with other utilities that currently own and operate these gas turbines, EKPC concluded that some utilities had experienced operational reliability problems. Consequently, EKPC selected the next lowest cost alternative, the GE LMS100s. EKPC indicated that the GE LMS100 units offer additional value to the EKPC system by virtue of their design, which makes them capable of running at higher capacity factors than traditional peaking gas turbines.

-5-                                    Case No. 2005-00053

All parties to this case agree on EKPC's need for additional generating capacity. The AG and Gallatin Steel Company have not questioned EnerVision's results or analysis. EKPC and EnerVision developed evaluation criteria which were used to evaluate each bid that was in compliance with the RFP. The criteria were finalized prior to EnerVision's receipt of any of the bids. Summaries were developed to characterize each bid. After the initial review, EnerVision began its detailed economic analysis of the remaining bids at its office in Atlanta, and EKPC performed its analysis at its office in Winchester, Kentucky. The results of the analyses were not shared between EKPC and EnerVision until the end of the evaluation process.

At the November 29, 2005 hearing, EKPC indicated that construction of the transmission facilities needed to provide export capacity for the proposed CTs will not be completed until 2009. Therefore, EKPC will not be able to operate all the proposed CTs, which are scheduled for completion in 2008, simultaneously with the existing seven Smith CTs. EKPC's analysis filed after the hearing shows that delaying commercial operation of the proposed CTs until completion of the needed transmission facilities will result in approximately $22.8 million in increased costs, consisting of $11.9 million in higher power production and/or power purchase costs and $10.9 million in additional costs due to construction schedule delay charges. EKPC indicates that, at a price of $10 per MCF for natural gas (a price which has been experienced in recent months), operating the proposed CTs with their high efficiency levels will save about $30 per MWh compared to the cost of operating EKPC's existing CTs, which are less efficient.

Case No. 2005-00053

## SITE ASSESSMENT REPORT

KRS 278.216 provides that no utility may begin the construction of a generating unit greater than 10 MW without first obtaining a Site Compatibility Certificate from the Commission. To obtain a Site Compatibility Certificate, a utility can prepare and submit a site assessment report, as prescribed in KRS 278.708(3) and (4), which describes in detail surrounding land uses, the location of existing facilities and infrastructure, anticipated noise levels, compatibility with scenic surroundings, potential changes in property values, and the impact on road and rail traffic. In lieu of submitting a site assessment report, KRS 278.216(2) provides that a utility may file, and the Commission may accept, documentation of compliance with the National Environmental Policy Act ("NEPA").

EKPC's application included copies of environmental assessment reports prepared for the Smith Site for submission to RUS to demonstrate compliance with NEPA. Those reports were filed here to support EKPC's request for a Certificate of Site Compatibility based on NEPA compliance in lieu of filing a site assessment report as described in KRS 278.216(2). The application stated that RUS approval under NEPA was anticipated.

EKPC subsequently indicated in response to a data request that, as of March 27, 2006, the NEPA review process was still ongoing and no definitive dates for completion of that process was given. The Commission then issued an Order on April 18, 2006 holding this case in abeyance until such time as EKPC would file documentation of compliance with NEPA or, alternatively, a site assessment report pursuant to KRS 278.216(2). EKPC then filed, on May 8, 2006, a site assessment report prepared

by its own employees.  On June 26, 2006, EKPC notified the Commission that EKPC had commenced taking bids on major components of the equipment needed to construct the proposed generating facilities, that a number of those bids were about to expire, and that EKPC would incur significant and escalating cost increases if a CPCN was not issued by July 1, 2006.  The Commission then held an informal conference on July 5, 2006 to discuss EKPC's site assessment report and its equipment bids.

EKPC agreed at the informal conference to submit a revised site assessment report prepared by an independent consultant, and that report was filed on July 25, 2006.  EKPC subsequently filed on July 28, 2006 supplemental information relating to mitigation of increased traffic flows in the vicinity of the Smith site.

The Commission finds that the revised site assessment report satisfies the requirements of KRS 278.216(2) and is reasonable.  The report shows that there will be no significant impact to the land surrounding the Smith site and that the proposed generating facilities will have no adverse impact on the area surrounding the site.  To mitigate noise impacts from the proposed generating facilities, EKPC will install mufflers and silencers on the units.  In addition, the work schedules for construction workers will be staggered to mitigate traffic congestion at the intersection of KY 89 and the site access road.  The Commission concludes that the proposed facilities will have no adverse impact on the area surrounding the site.

<u>SUMMARY OF FINDINGS</u>

Based on the evidence of record and being otherwise sufficiently advised, the Commission finds:

1.     EKPC needs additional base load and peaking generating capacity to meet the projected demands of its 16 existing distribution cooperative members and to serve the power requirements of Warren RECC beginning April 2008.

2.     EKPC's analyses, which show that the proposed Smith CFB and the Smith CTs 8-12 are the best, least-cost options to meet its system's projected demands, are reasonable.

3.     EKPC's revised site assessment report prepared by an independent consultant is reasonable and the mitigation measures discussed therein should be adopted by EKPC.

IT IS THEREFORE ORDERED that:

1.     EKPC is granted a CPCN to construct the 278 MW Smith CFB generating unit and the five 90 MW Smith CTs 8-12 in Clark County, Kentucky.

2.     EKPC is granted a Certificate of Site Compatibility to construct the 278 MW Smith CFB generating unit and the five 90 MW Smith CTs 8-12 in Clark County, Kentucky.

Done at Frankfort, Kentucky, this 29th day of August, 2006.

By the Commission



ATTEST:

Executive Director

Case No. 2005-00053

ATTACHMENT 2

COMMONWEALTH OF KENTUCKY

BEFORE THE PUBLIC SERVICE COMMISSION

In the Matter of:

| | | |
|---|---|---|
| AN INVESTIGATION INTO EAST KENTUCKY | ) | |
| POWER COOPERATIVE, INC.'S CONTINUED | ) | CASE NO. |
| NEED FOR CERTIFICATED GENERATION | ) | 2006-00564 |

O R D E R

This matter is before the Commission as an investigation into the continued need of East Kentucky Power Cooperative, Inc. ("EKPC") for certificated generation in light of the decision by Warren Rural Electric Cooperative Corporation ("Warren") to terminate a power supply agreement with EKPC.

BACKGROUND

EKPC is a generating and transmission cooperative which is organized under KRS Chapter 279 and currently provides service to 16 electric distribution cooperatives in Kentucky. On May 27, 2004, EKPC executed a Special Membership Agreement with Warren, which had historically purchased its power supply from the Tennessee Valley Authority ("TVA"). Because TVA is not subject to the Commission's regulatory jurisdiction, the Commission had no authority to review the reasonableness of the decision by Warren to become a member of EKPC. Under the terms of the power supply agreement, EKPC was obligated to provide electric service to Warren commencing on April 1, 2008, upon the termination of Warren's power supply contract with TVA. Warren was to become EKPC's 17th distribution cooperative.

To facilitate the entry of Warren into the EKPC system, EKPC proposed to construct a 97-mile transmission line to carry the Warren load.[1]  Additionally, EKPC proposed to construct two base load generation units (one in Mason County and one in Clark County) and five peaking generation units.  The generation units are the subject of this investigation.

On December 8, 2006, Warren decided to renounce the power supply agreement it had entered into with EKPC and to remain within the TVA system.  The loss of Warren's load in the midst of EKPC's ambitious construction program and deteriorating financial condition led the Commission to conclude that this proceeding was necessary to determine that EKPC's certificated generation was still needed and in the public interest.

<u>PROCEDURAL HISTORY</u>

This investigation was commenced on January 5, 2007, on the Commission's own motion.  The Attorney General and Gallatin Steel were made parties to this proceeding as part of that Order.  The Commission also established a procedural schedule in this proceeding and an amendment thereto that provided for three rounds of discovery upon EKPC, to which EKPC timely responded, and for a hearing on March 6, 2007.

---

[1]  The final disposition of the certificate for the Warren transmission line is currently before the Commission.  Though EKPC was granted a certificate to construct the transmission line, Warren's decision has led EKPC to the conclusion that they have no further need for the certificate.  See Case No. 2005-00207, The Application of East Kentucky Power Cooperative, Inc. for a Certificate of Public Convenience and Necessity to Construct a 161 kV Transmission Line in Barren, Warren, Butler and Ohio Counties, Kentucky, Informal Conference Memo, dated April 23, 2007.

The Cumberland Chapter of the Sierra Club moved for intervention on February 12, 2007. That motion was denied from the bench on March 6, 2007 and by Order entered March 21, 2007. The Sierra Club filed a motion for rehearing of the denial of the intervention motion, which was also denied by Order entered April 19, 2007.

The scope of this proceeding was set forth in the Commission's January 5, 2007 Order, which stated:

> The scope of this proceeding will be limited to EKPC's continued need for the certificated generation. The Commission has previously found the certificated projects to be the most reasonable and lowest-cost options for provisioning EKPC's distribution cooperatives with the power they require both now and in the future.

Evidence was taken at a public hearing held at the Commission's offices on March 6, 2007. In an Order entered on March 14, 2007, a deadline for filing briefs was established. On March 16, 2007, EKPC filed responses to requests for information arising out of the March 6, 2007 hearing. The record is now complete and stands submitted to the Commission for decision.

## STATUTORY AUTHORITY

The Commission's authority to determine whether there is a continued need for the certificated generation that EKPC plans to construct derives from KRS 278.260(1), which confers upon the Commission the authority to conduct an investigation as to whether "any regulation, measurement, practice or act affecting or relating to the service of the utility or any service in connection therewith is unreasonable, unsafe, insufficient or unjustly discriminatory. . . ." Likewise, KRS 278.280(1) provides the statutory criteria for conducting this investigation:

> Whenever the Commission. . .finds that the rules, regulations, practices, equipment, appliances, facilities or service of any utility subject to its jurisdiction, or the method of manufacture, distribution, transmission, storage or supply employed by such utility, are unjust, unreasonable, unsafe, improper, inadequate or insufficient, the commission shall determine the just, reasonable, safe, proper, adequate or sufficient rules, regulations, practices, equipment, appliances, facilities, service or methods to be observed, furnished, constructed, enforced or employed, and shall fix the same by its order, rule or regulation.

See also Kentucky Utilities Co. v. Public Service Commission, 252 S.W.2d 885, 890 (Ky. 1952).

## DISCUSSION

EKPC's currently certificated, but incomplete, generation assets include: (1) a 278 MW Circulating Fluidized Bed ("CFB") unit in Mason County designated as Spurlock No. 4;[2] (2) a 278 MW CFB unit in Clark County designated as Smith No. 1;[3] and (3) five 90 MW combustion turbine ("CTs") units in Clark County designated as CTs 8-12.[4] The present investigation was precipitated by the termination of a power supply agreement by Warren on or about December 8, 2006, and the resulting loss of Warren's anticipated load from the EKPC system. Despite losing the Warren load, EKPC

---

[2] Case No. 2004-00423, Application of East Kentucky Power Cooperative, Inc. for a Certificate of Public Convenience and Necessity, and a Site Compatibility Certificate, for the Construction of a 278 MW (Nominal) Circulating Fluidized Bed Coal Fired Unit in Mason County, Kentucky.

[3] Case No. 2005-00053, Application of East Kentucky Power Cooperative, Inc. for a Certificate of Public Convenience and Necessity, and a Site Compatibility Certificate, for the Construction of a 278 MW (Nominal) Circulating Fluidized Bed Coal Fired Unit and Five 90 MW (Nominal) Combustion Turbines in Clark County, Kentucky.

[4] See id.

estimates that it will need 774 MW of additional generating capacity by 2011 to meet its native load requirements and 12 percent reserve margins.[5]

<u>SPURLOCK NO. 4</u>

The certificate for Spurlock No. 4 was issued by the Commission on September 19, 2005, in an Order providing that, "under the terms of the membership agreement, [EKPC] is obligated to provide electric service to [Warren] commencing April 1, 2008, upon the termination of [Warren]'s current supply contract with TVA."[6] Construction on Spurlock No. 4 began in June of 2006, and the unit is scheduled to come online in April of 2009.[7] As of the date of the hearing in this proceeding, the engineering on Spurlock No. 4 was 95 percent complete, and 24 of 25 contracts had been awarded.[8] As of November 30, 2006, over $210 million had been expended on Spurlock No. 4.[9] In light of Warren's decision to terminate the power supply agreement, EKPC asserts that Spurlock No. 4 is "a critical resource for meeting EKPC's member system load requirements and overcoming the current capacity deficit."[10] EKPC also asserts that, by completing Spurlock No. 4, it will avoid the need to purchase more

---

[5]  <u>See</u> EKPC Brief, filed April 10 ("EKPC Brief") at 8 (citing EKPC Response to Supplemental Data Request, Response 2 and EKPC Response to Initial Data Request, Response 14(a).

[6]  Case No. 2004-00423, Order dated Sept. 13, 2005 at 3.

[7]  <u>See</u> EKPC Response to Initial Data Request, Item No. 1(a); EKPC Brief at 7.

[8]  <u>See id.</u>

[9]  <u>See id.</u>

[10]  EKPC Response to Supplemental Data Request, Item No. 2.

costly power from the market without building generation resulting in excess generation capacity.[11]

The Commission accepts EKPC's justifications for the continued need of the Spurlock No. 4 unit despite the termination of the power supply agreement by Warren. Although Spurlock No. 4 will not serve the load of a new cooperative when it comes online, there is sufficient evidence within the record to demonstrate that the addition of this generation unit to EKPC's fleet will serve EKPC's native load, ease demand for more expensive purchased power, and improve the overall system reliability.[12] Accordingly, EKPC should be permitted to continue with the construction of the Spurlock No. 4 unit as originally certificated.

### SMITH NO. 1

The certificate for the Smith No. 1 unit was awarded on August 29, 2006, upon the finding that the unit would "provide base load capacity needed to meet the growing demand of EKPC's 16-member cooperatives."[13] EKPC asserts that growing demand in its native base load continues to be the principal purpose behind Smith No. 1.[14] It also asserts that completion of the Smith No. 1 unit will forestall a need to

---

[11] See James Lamb Testimony at 2.

[12] The Commission takes note that a forced outage of the Spurlock No. 1 unit in July 2004 required EKPC to purchase significant amounts of replacement power. This event and EKPC's delay in bringing the Gilbert unit, also in Mason County, into base rates have contributed heavily to the significant decline in EKPC's overall financial condition.

[13] Case No. 2005-00053, Order dated August 29, 2006 at 2.

[14] See EKPC Response to Supplemental Data Request, Item No. 3.

add capacity from an additional 278 MW CFB base load unit until the winter of 2017.[15]

EKPC has not yet obtained either an air permit or a supplemental environmental impact statement necessary to satisfy the Rural Utilities Service's ("RUS") environmental analysis requirements for Smith No. 1.[16] Despite this, construction is scheduled to begin on Smith No. 1 in September of 2007.[17] At this point, engineering on Smith No. 1 is 30 percent complete.[18] Nine of 27 contracts totaling approximately $318 million have been awarded.[19] Of this, EKPC has actually spent approximately $37.1 million and has additional commitments of approximately $11.5 million.[20] EKPC estimates that the cost of canceling Smith No. 1 would be approximately $50 million.[21] Delaying construction on Smith No. 1 would likely result in increased material and labor costs and increased purchased power expenditures.[22]

---

[15] See EKPC Response to Initial Data Request, Item No. 8.

[16] See EKPC Response to Initial Data Request, Item No. 1(b).

[17] See id.

[18] See id.

[19] See id.

[20] See EKPC Response to Third Data Request, Item No. 3.

[21] See id.

[22] See EKPC Response to Supplemental Data Request, Item No. 5. EKPC estimates that material prices could escalate by up to 30 percent over a 5-year period and labor costs are expected to rise at an annual rate of approximately 3 percent. However, the difference in net present value of delaying Smith No. 1 for completion until 2018 is only estimated to be $62 million. See EKPC Response to Third Data Request, Item No. 5.

EKPC originally forecasted an online date for Smith No. 1 in August of 2010,[23] but this date has now slipped to June of 2011.[24] The delay of in-service dates lessens the likelihood that EKPC will overbuild its generation fleet with excess capacity. Although EKPC steadfastly denies that construction of Smith No. 1 on the present time frame will result in the build-out of excess generation,[25] it points out that Smith No. 1 will produce power at a rate below current spot prices.[26] The less costly power generated from Smith No. 1 will be sold to EKPC's members.  Only more costly power – if available – would be used for off-system sales.[27]  EKPC also contends that without Smith No. 1 coming on-line as currently scheduled, EKPC will face greater exposure to reliability risks to the system due to the decreasing availability of firm transmission service and potential delivery disruptions resulting from [independent system operator] actions.[28]  Because it does not anticipate having any excess generation capacity, EKPC has not entered into any off-system power supply agreements, nor does it foresee the

---

[23] See EKPC Response to Initial Data Request, Item No. 1(b).

[24] See James Lamb Testimony, Answer 10, n 1; EKPC Brief at 9.

[25] See EKPC Response to Third Data Request, Item No. 8.

[26] See EKPC Response to Third Data Request, Item No. 7(c).

[27] See Id.

[28] See James Lamb testimony at 13.

Case No. 2006-00564

need to market excess power.[29]  EKPC does, however, utilize the services of an affiliate, ACES Power Marketing, to facilitate off-system purchases and sales.[30]

Again, there is sufficient evidence within the record to demonstrate that the addition of this generation unit to EKPC's fleet, as with the Spurlock No. 4 unit, is needed to serve EKPC's growing native load, ease demand for more expensive purchased power, and improve the overall system reliability.  Smith No. 1 is unique, however, in that physical construction has not yet begun and the unit still largely exists only on paper.  Thus, the Commission would not authorize the construction to go forward unless it is satisfied that doing so is also consistent with the public interest.

With regard to the Smith No. 1 unit, there are two alternatives to consider.  The Commission might order EKPC to purposefully delay the construction of Smith No. 1 to guarantee that its native load requirements are sufficient to support the addition of the generating unit.  This course of action, however, would result in the levying of significant contractual penalties on EKPC and increase its exposure to escalating costs for labor and materials in the future.  On the other hand, the Commission might allow EKPC to proceed with construction of the Smith No. 1 unit and run the risk that EKPC's native load growth might not grow as quickly as forecasted -- potentially resulting in EKPC having excess generation capacity.  While neither situation is ideal, the latter position is clearly preferred under the specific facts of this case.  In the long run, EKPC's ratepayers and the public interest at large will be best served by allowing EKPC to

---

[29]  See EKPC Response to Third Data Request, Item No. 8.

[30]  See EKPC Response to Initial Data Request, Item No. 4; James Lamb Testimony, Answer 18.

complete the construction of Smith No. 1 and avoid unnecessary penalties and cost escalations associated with a lengthy delay. Any risk of reaching a situation where EKPC has excess generation capacity should be mitigated by EKPC's careful development and implementation of a mechanism for making off-system sales. Accordingly, EKPC will be permitted to continue with the construction of the Smith No. 1 unit as originally certificated but should develop and implement an appropriate plan for facilitating off-system sales if the opportunity arises.

<u>CTS 8-12</u>

The certificates for CTs 8-12 were awarded on August 29, 2006, upon the finding that the units "will provide peaking capacity and will partially replace a purchase power contract, which expired in 2005, for peaking capacity of 150 MW in the winter and 75 MW in the summer. Two of the proposed CTs will provide the future peaking requirements, including reserves, for EKPC's newest distribution cooperative member, [Warren]."[31] With the subsequent cancellation of the Warren power supply agreement, the rationale for the remaining two CTs has changed to simply serving native base and peak loads and to meeting reserve targets.[32]

The five certificated CTs are for General Electric ("GE") model LMS 100 simple cycle combined gas turbine generators.[33] The original contract was signed in March of 2005 and required a "full notice to proceed" statement from EKPC no later than

---

[31] Case No. 2005-00053, Order dated August 29, 2006 at 2.

[32] EKPC Response to Supplemental Data Request, Item No. 4.

[33] <u>See</u> EKPC Response to Initial Data Request, Item No. 1(c).

September 1, 2005.[34]  When EKPC failed to timely secure NEPA compliance from RUS for the Smith site, it was forced to alternatively seek a certificate of site compatibility from the Commission under KRS 278.216.    This was granted on August 29, 2006.[35] Following Warren's termination of the power supply agreement in December 2006, EKPC declined to purchase three of the CTs and began to renegotiate a contract with GE for only two of the CTs.[36]  The total cost of CTs 8-9 grew from an original price of approximately $94 million to a total price of approximately $140 million.[37]  This price escalation has most recently resulted in EKPC considering whether to purchase GE model 7EA CTs,[38] priced at approximately $33 million per unit, rather than the more efficient and more expensive LMS 100s.[39]  Under the new arrangement, EKPC would likely be required to tender $30 million to GE on or before September 1, 2007.[40]  It would also need to seek a revision to its air permit.[41]  EKPC anticipates that CTs 8-9 will enter service during the second quarter of 2009 – well ahead of the 2010-2011 winter

---

[34]  See id.

[35]  See Case No. 2005-00053, Order dated August 29, 2006.

[36]  See EKPC Response to Initial Data Request, Item No. 1(c).

[37]  See EKPC Response to Third Data Request, Item No. 1(c).

[38]  EKPC's CTs 1-7 at the Smith Station are also GE model 7EA CTs, giving EKPC a better understanding of their economic and operational characteristics.

[39]  See EKPC Response to Third Data Request, Item No. 1(c).

[40]  See id.

[41]  See id.

peak.[42] Through December 31, 2006, EKPC has expended approximately $4.6 million for engineering work on the two CTs.[43]

The Commission is confronted with essentially the same question with regard to CTs 8-9 as with the Smith No. 1 unit. While there is a chance that EKPC's native load growth will not grow as expected, thereby obviating the need for peaking generation, the totality of circumstances falls in favor of allowing the construction to proceed. While it could be more cost-effective to purchase peaking power, it is more likely in this particular case that delaying CTs 8-9 will result in substantial contractual penalties and inhibit EKPC from more efficiently and economically dispatching its generation units. Furthermore, it is not possible to accurately determine whether interim purchases of peaking power will offer any long-term savings to EKPC, given the many variables (i.e., weather, fuel prices) associated with entering into the spot market for power. On the basis of the information presented in the record, the Commission will accept EKPC's rationale for keeping the certificates for CT No. 8 and CT No. 9 and will allow the construction to proceed as certificated. Should EKPC decide to switch the model of the peaking units to be constructed (e.g., from LMS 100s to 7EAs), it is reminded that such action would require Commission approval.

EKPC also appears to have settled on the disposition of CTs 10-12. It now agrees that the certificates for CTs 10-12 should be rescinded.[44] EKPC states that it will likely seek a new Certificate of Public Convenience and Necessity for CTs 10-12

---

[42] See id.; EKPC Brief at 11.

[43] See EKPC Response to Initial Data Request, Item No. 1(c).

[44] See James Lamb testimony, Answer 17.

sometime around 2011, with deliveries of one CT scheduled for each year between 2012 and 2014.[45] EKPC anticipates that it will thereby avoid having "excess capacity above the projected total requirements."[46] The Commission agrees that the final three certificated CTs are not needed at this time.   Accordingly, it accepts EKPC's surrendering of the certificates issued on August 29, 2006 for CTs 10-12.

IT IS THEREFORE ORDERED that:

1.    EKPC shall retain the Certificates of Public Convenience and Necessity for the Spurlock No. 4 unit, the Smith No. 1 unit, and the Smith CTs 8-9.

2.    EKPC's surrender of the Certificates of Public Convenience and Necessity for the Smith CTs 10-12 is accepted and said certificates are heretofore deemed null and void.

3.    This investigation is closed and this case shall be removed from the Commission's docket.

4.    This is a final and appealable Order.

Done at Frankfort, Kentucky, this 11th day of May, 2007.

By the Commission

ATTEST:

Executive Director

---

[45] See EKPC Response to Initial Data Request, Item No. 3.

[46] See id.

Ernie Fletcher
Governor

Teresa J. Hill, Secretary
Environmental and Public
Protection Cabinet

Timothy J. LeDonne
Commissioner
Department of Public Protection

Commonwealth of Kentucky
**Public Service Commission**
211 Sower Blvd.
P.O. Box 615
Frankfort, Kentucky 40602-0615
Telephone: (502) 564-3940
Fax: (502) 564-3460
psc.ky.gov

Mark David Goss
Chairman

John W. Clay
Commissioner

May 11, 2007

Lawrence W. Cook
Assistant Attorney General
Office of the Attorney General Utility & Rate Intervention Division
1024 Capital Center Drive
Suite 200
Frankfort, KY 40601-8204

## CERTIFICATE OF SERVICE

RE: Case No. 2006-00564
East Kentucky Power Cooperative, Inc.

   I, Beth O'Donnell, Executive Director of the Public Service Commission, hereby certify that the enclosed attested copy of the Commission's Order in the above case was served upon the addressee by U.S. Mail on May 11, 2007.



_____
Executive Director

BOD/sh
Enclosure



**Ernie Fletcher**
Governor

**Teresa J. Hill, Secretary**
**Environmental and Public**
**Protection Cabinet**

**Timothy J. LeDonne**
**Commissioner**
**Department of Public Protection**

Commonwealth of Kentucky
**Public Service Commission**
211 Sower Blvd.
P.O. Box 615
Frankfort, Kentucky 40602-0615
Telephone: (502) 564-3940
Fax: (502) 564-3460
psc.ky.gov

**Mark David Goss**
Chairman

**John W. Clay**
Commissioner

May 11, 2007

Honorable Michael L. Kurtz
Attorney at Law
Boehm, Kurtz & Lowry
36 East Seventh Street
2110 CBLD Building
Cincinnati, OH 45202

## CERTIFICATE OF SERVICE

RE: Case No. 2006-00564
    East Kentucky Power Cooperative, Inc.


I, Beth O'Donnell, Executive Director of the Public Service Commission, hereby certify that the enclosed attested copy of the Commission's Order in the above case was served upon the addressee by U.S. Mail on May 11, 2007.




                                                    _____
                                                    Executive Director



BOD/sh
Enclosure





Ernie Fletcher
Governor

Teresa J. Hill, Secretary
Environmental and Public
Protection Cabinet

Timothy J. LeDonne
Commissioner
Department of Public Protection

Commonwealth of Kentucky
**Public Service Commission**
211 Sower Blvd.
P.O. Box 615
Frankfort, Kentucky 40602-0615
Telephone: (502) 564-3940
Fax: (502) 564-3460
psc.ky.gov

Mark David Goss
Chairman

John W. Clay
Commissioner

May 11, 2007

Honorable Charles A. Lile
Senior Corporate Counsel
East Kentucky Power Cooperative, Inc.
4775 Lexington Road
P. O. Box 707
Winchester, KY 40392-0707

## CERTIFICATE OF SERVICE

RE: Case No. 2006-00564
    East Kentucky Power Cooperative, Inc.


I, Beth O'Donnell, Executive Director of the Public Service Commission, hereby certify that the enclosed attested copy of the Commission's Order in the above case was served upon the addressee by U.S. Mail on May 11, 2007.



_____
Executive Director


BOD/sh
Enclosure



ATTACHMENT 3

COMMONWEALTH OF KENTUCKY

BEFORE THE PUBLIC SERVICE COMMISSION

In the Matter of:

| | | |
|---|---|---|
| APPLICATION OF EAST KENTUCKY POWER | ) | |
| COOPERATIVE, INC. FOR A CERTFICATE OF | ) | |
| PUBLIC CONVENIENCE AND NECESSITY FOR | ) | CASE NO. 2006-00463 |
| THE CONSTRUCTION OF A 345 KV ELECTRIC | ) | |
| TRANSMISSION PROJECT IN CLARK, MADISON, | ) | |
| AND GARRARD COUNTIES, KENTUCKY | ) | |

O R D E R

East Kentucky Power Cooperative, Inc. ("EKPC") has applied for a Certificate of Public Convenience and Necessity ("CPCN") to construct or rebuild approximately 35.6 miles of 345 kV transmission line. Finding that the public convenience and necessity require the proposed transmission line, we grant the requested relief.

BACKGROUND

EKPC, a rural electric cooperative organized pursuant to KRS Chapter 279, owns and operates facilities that generate and transmit electric energy for sale at wholesale to 16 member distribution cooperatives which jointly own it. The member cooperatives purchase their total power from EKPC and distribute the power to approximately 504,492 retail customers in 89 central and eastern Kentucky counties.

PROCEDURE

On April 20, 2007, EKPC filed notice of its intent to file an application for a CPCN to construct a 345 kV transmission line.[1] On May 22, 2007, EKPC filed its application. On August 15, 2007, EKPC amended its application to increase the centerline-to-centerline separation on a portion of the co-located sections of the proposed facilities from 75 feet to 125 feet and to revise certain property owner information.

On June 1, 2007, the Commission established a procedural schedule for this proceeding, extended the statutory period in which a decision is required to 120 days,[2] and directed that the services of a competent, qualified, and independent firm be retained to assist in the Commission's review of EKPC's application.[3]

The Commission subsequently retained The Liberty Consulting Group of Quentin, Pennsylvania ("Liberty"), to review EKPC's analyses regarding the need for, and engineering aspects of, the proposed high voltage transmission line. On June 25, 2007, Liberty submitted a report of its review and its conclusions regarding the proposed construction.

---

[1] EKPC originally filed its notice of intent on October 31, 2006. Unable to file its application within the 6-month period that 807 KAR 5:120, Section(1), requires, EKPC "renewed" its original notice on April 20, 2007. See Letter from Sherman Goodpaster III, EKPC Senior Corporate Counsel, to Beth O'Donnell, Executive Director, Public Service Commission (April 17, 2007).

[2] KRS 278.020(8) provides that "[t]he commission shall issue its decision no later than ninety (90) days after the application is filed, unless the commission extends this period, for good cause, to one hundred twenty (120) days."

[3] See KRS 278.020(8) ("[t]he commission may utilize the provisions of KRS 278.255(3) if, in the exercise of its discretion, it deems it necessary to hire a competent, qualified and independent firm to assist it in reaching its decision").

-2-                    Case No. 2006-00463

Phillip Price and Deidra Price are the only persons who sought intervention in this proceeding. On June 22, 2007, the Commission granted Mr. and Mrs. Price leave to intervene in this matter as limited intervenors.

After conducting discovery in this matter, the Commission, on its own motion, held a local public meeting in Richmond, Kentucky on August 2, 2007,[4] and an evidentiary hearing in Frankfort, Kentucky on August 22, 2007. At the evidentiary hearing, the following persons testified: Mary Jane Warner, EKPC's Manager of Power Delivery Expansion; Darrin Adams, Manager of Transmission Planning, EKPC's Power Supply Business Unit; and Bryan Kirby, an owner of property on which the proposed facilities will be located.

### STATEMENT OF THE CASE

EKPC proposes to construct 35.6 miles of 345 kV transmission line from its J. K. Smith Generating Station ("Smith Station") in Clark County to its proposed West Garrard Substation near Lancaster, Kentucky.[5] Approximately 9 miles of the transmission line will be constructed along newly acquired right-of-way. Approximately 14.8 miles of the transmission line will be constructed on existing right-of-way and parallel to an existing transmission line. The remaining 11.8 miles of line will be a rebuild of existing transmission lines located on existing right-of-way.[6] EKPC contends that the proposed construction is "needed to enable EKPC to reliably deliver energy

---

[4] The purpose of the local public hearing was to take public comment on the proposed facilities.

[5] Application at 3.

[6] Id.

from its existing and planned future generating resources to its member systems."[7]
EKPC currently has plans to construct two combustion turbines and a 278-MW coal-fired base unit at the Smith Station.[8]

EKPC used the Kentucky Transmission Line Siting Model ("Kentucky Siting Model") to develop the route of the proposed transmission line from the Smith Station to the West Garrard Substation. Using the model, it first developed "macrocorridors" and "alternative corridors"[9] and then narrowed its analysis to 16 possible routes along the alternative corridors.[10] After further application of the siting methodology, it determined that the best routes were Er, Gr, and Hr. Based upon the judgment of its siting personnel, EKPC then determined that Route Hr was the best choice among these routes.[11]

---

[7]    Testimony of Darrin Adams at 2.

[8]    See Case No. 2005-00053, Application of East Kentucky Power Cooperative, Inc. for a Certificate of Public Convenience and Necessity and a Site Compatibility Certificate, for the Construction of a 278 MW (Nominal) Circulating Fluidized Bed Coal Fired Unit and Five 90 MW (Nominal) Combustion Turbines in Clark County, Kentucky (Ky. PSC Aug. 29, 2006); Case No. 2006-00564, An Investigation Into East Kentucky Power Cooperative, Inc.'s Continued Need for Certificated Generation (Ky. PSC May 7, 2007).

[9]    Transcript of 8/22/2007 Hearing at 38.

[10]    Id. at 19. See also Application at Exhibit 10.

[11]    According to the Kentucky Siting Model, "[e]ach siting team member ranks the top scoring routes based on several important considerations:  visual concerns, community concerns, schedule delay risk, special permit issues, and construction and maintenance accessibility."

Although Route Hr is the most expensive of the three best routes,[12] it contains the largest portion of rebuild. Route Hr had 11.8 miles of rebuild compared to 7.9 miles for Route ER and 7.7 miles for Route Gr.[13] According to EKPC, the greater the amount of rebuild that a route possesses, the more desirable the route.[14] While rebuilding is generally more expensive than the construction of new line, it does not require the acquisition of new easements. Rebuild lines generally run along existing easements. Amending and expanding existing easements for a rebuild is generally much faster and easier than acquiring greenfield easements. It allows the construction schedule to move forward more quickly.[15] According to EKPC, rebuilding an existing line is more acceptable to the community than the construction of a new line.[16]

Based upon its review of EKPC's application and interviews of EKPC personnel, Liberty concluded that EKPC needs the proposed facilities "on the proposed schedule in order to meet the electric service requirements of serving native load customers

---

[12] EKPC determined the cost of the three best routes as follows:

| Route | Cost |
|---------|--------------|
| Route Er | $37,154,045 |
| Route Gr | $36,893,565 |
| Route Hr | $38,112,921 |

Transcript of 8/22/2007 Hearing at 77; Application at Exhibit 10.

[13] Transcript of 8/22/2007 Hearing at 23; Application at Exhibit 10.

[14] Transcript of 8/22/2007 Hearing at 68.

[15] Id. at 72.

[16] Id.

resulting from the additional new Commission-approved generation at the J.K. Smith Generating Station."[17]

Liberty also examined additional projects that EKPC considered as alternatives to the proposed construction and concluded that EKPC had properly considered the possibilities of upgrading the voltage of existing facilities, adding new generation and improving the power factor of the system, and wheeling power through an alternative interconnection. It found that none of these alternatives are viable.[18]

Liberty found that the preferred alternative route is reasonable and that the route takes maximum advantage of co-location opportunities.[19] It further recommended that the Commission permit some flexibility in its final determination of the actual centerline to address landowner concerns.[20]

<u>DISCUSSION</u>

To establish that the public convenience and necessity require the construction of a new facility, an applicant must demonstrate the need for the proposed facilities and that their proposed construction will not result in the wasteful duplication of facilities.[21] EKPC has presented substantial evidence that the construction of additional generation facilities at its Smith Station will require the construction of the proposed transmission

---

[17] The Liberty Consulting Group, "Final Report: Focused Review of Documentation Filed by East Kentucky Power Cooperative, Inc. For a Proposed 345kV Transmission Line Within Kentucky" (June 25, 2007) at I-4.

[18] <u>Id.</u> at III-1 to III-13.

[19] <u>Id.</u> at III-12.

[20] <u>Id.</u>

[21] <u>Kentucky Utilities Co. v. Public Service Comm'n</u>, 252 S.W.2d 885 (Ky. 1952).

main.[22] Liberty examined whether EKPC had given adequate consideration of wheeling power through another utility's system and determined that EKPC had given adequate consideration to that alternative and had reasonably rejected it in favor of constructing the proposed line.[23]

In rendering our decision, we are mindful of the concerns of landowners and local residents. The Kirby family voiced several concerns regarding the placement of the proposed transmission main and its effect on their property in Lancaster, Kentucky. They noted that the proposed route will cross over an existing Kentucky Utilities Company ("KU") transmission line and thus divide their property into four quadrants. They further questioned the fairness and appropriateness of EKPC's route selection analysis as applied to their property.

The evidence shows that the proposed route cannot avoid intersecting the route of the existing KU transmission line. At the Commission's direction, EKPC prepared an additional map showing the characteristics of the land below the point at which segment 11 of the EKPC proposed line would cross the existing KU transmission line that overhangs the Kirby farm.[24] This map shows that the EKPC line would intersect the KU

---

[22] One commenter questioned EKPC's need for new generation facilities at Smith Station and the local area's need for the generation from those generation facilities. He asserted that the "grid system was to correct any need for additional lines by allowing utilities to purchase or sell power from other utility plants." Letter from Earl Johnson to Public Service Commission (Aug. 10, 2007). The Commission has previously addressed the need for the generation facilities in issue. See supra note 8. Our review of the record indicates no evidence to support the proposition that the existence of a grid system has totally eliminated the need for transmission lines in this state.

[23] Liberty at III-4.

[24] Transcript of 8/22/2007 Hearing, Commission Staff Exhibit 2.

line and divide the property underneath it just as the proposed line will divide the Kirby property. Thus, even if the Commission ordered EKPC to re-route the line along segments 12 and 13, the EKPC line would still cross the KU line over another person's property in the same manner. .The EKPC line will undoubtedly have an adverse impact on the value of the Kirbys' property. However, the determination of that devaluation falls outside the purview of the Commission's jurisdiction.

We have considered and find no basis to the Kirby family's objections to the use of rights-of-way as a scoring measure in the route selection analysis. Route Hr scored better in this category because it crossed fewer planned developments than Route Er or Route Gr.[25] Under the Kentucky Siting Model, routing a transmission line over a subdivision is not preferred.[26] We find that giving additional "points" to a particular route based on its crossing fewer planned developments is logical and reasonable.

The Kirby family also contended that the route selection analysis considered a platted subdivision whose plat was not filed with the local Property Valuation Administrator ("PVA"). The Kirby family's failure to identify the specific location of the subdivision limits the Commission's ability to evaluate their objection. The record clearly indicates that EKPC obtained its information regarding planned developments from both local PVA offices and planning and zoning offices and consistently applied the Kentucky Siting Model.[27] We find no evidence that EKPC's scoring methodology was

---

[25] Application at Exhibit 10.

[26] Transcript of 8/22/2007 Hearing at 65.

[27] Id. at 66.

unreasonable or that the existence of an "unfiled" subdivision plat would render EKPC's selection invalid.

The Kirby family also voiced concerns about EKPC's possible use of herbicides along the right-of-way in areas which might contaminate the drinking water of the Kirbys' livestock. We note that these concerns are speculative. The Commission's authority over the methods that a utility may use to manage its right-of-way, moreover, is limited and does not include proscribing the use of herbicides. While this concern is insufficient to require modification of the proposed transmission line route, the Commission encourages EKPC to conduct its right-of-way management in a manner that will not result in any waste or harm to any property owner's land or livestock.

The Prices urge the Commission to require the proposed transmission line to be placed underground to address aesthetic, property value, health, and environmental concerns. The record, however, is totally lacking any evidence regarding the costs and benefits from such action. Without such evidence, we cannot evaluate or act on such proposal.

Although the comments of John Logan were submitted beyond the comment deadline previously established for this case, the Commission has given them due consideration. The Commission examined Exhibit 8.10 of EKPC's application and observed that the current transmission line will be rerouted to cross directly over Mr. Logan's property.[28] While the Commission acknowledges Mr. Logan's comments

---

[28] It appears that the existing transmission line was routed around the Logan property to avoid the house that stood there prior to the 1977 fire to which Mr. Logan refers in his comments.

regarding possible future use of the property, the comments did not overcome EKPC's showing of the need to route the transmission line as proposed.

Several commenters allege that the proposed transmission lines may adversely affect the health of persons residing near those lines. None, however, have offered any evidence of such effects. This Commission is not aware of any recognized and accepted scientific study that conclusively supports these claims.

Finally, the Commission acknowledges its gratitude to the citizens who took time to participate in this matter by submitting written comments and by giving spoken comments at the local hearing and testimony at the formal public hearing. We carefully considered these comments in reaching our decision. The final determination in this matter was not easy, because the Commission understands the importance of those issues to each of the commenters.

## CONCLUSION

Having reviewed the evidence of record and being otherwise sufficiently advised, the Commission finds that the proposed 345 kV transmission line is necessary and reasonable and that its construction will not result in the wasteful duplication of facilities. We further find that EKPC's selection of Route Hr is reasonable in light of the circumstances.

In our prior Orders, this Commission has emphasized rebuilding and co-locating as goals of transmission planning. However, those goals may not necessarily be an overriding factor in every case. In some cases it is possible that choosing a route with more rebuild or co-location could make the overall cost of the preferred route unreasonable when compared to a route with less rebuild or co-location. The evidence

in this case supports the choice of Route Hr even though it is slightly more expensive than the other two possible routes.

The Commission also understands the need, in limited circumstances, to permit a utility the flexibility to address unanticipated construction issues. We therefore find that EKPC may move the approved centerline so long as: (1) it is no greater than 500 feet in either direction (i.e., within a 1,000-foot corridor) of the existing route; (2) the move does not shift the line or its right-of-way onto the property of a different landowner; and (3) the property owner who is subject to the move agrees in writing to the requested move. EKPC should file with the Commission a survey of the final location of the line after all moves are completed and before construction begins.

Any changes greater than this distance or involving landowners not identified in EKPC's application will require EKPC to file another application with the Commission. Likewise, if another agency requires an alteration of the line that does not meet all the conditions listed above, EKPC must apply for a CPCN for the modified route.

IT IS THEREFORE ORDERED that:

1.     EKPC is granted a CPCN to construct and operate the proposed transmission line as set forth in its application, as amended.

2.     EKPC shall file a survey of the final location of the line after any modifications are finalized as authorized herein and before construction begins.

3.     EKPC shall file "as-built" drawings or maps within 60 days of the completion of the construction authorized by this Order.

Done at Frankfort, Kentucky, this 19th day of September, 2007.

By the Commission

ATTEST:

Executive Director

Case No. 2006-00463



1  TIMOTHY J. HAGERTY
   (Kentucky State Bar No. 85414)
2  *Pro hac vice application pending*
   Frost Brown Todd LLC
3  400 W. Market St., 32nd Floor
   Louisville, Kentucky 40202
4  Telephone: (502) 589-5400
   Facsimile: (502) 581-1087
5  Email: thagerty@fbtlaw.com

6  KENNETH A. REICH
   (Massachusetts State Bar No. BBO 549464)
7  *Pro hac vice application pending*
   WolfBlock LLP
8  One Boston Place
   Boston, MA 02108
9  Telephone: (617) 226-4003
   Facsimile: (617) 226-4500
10 Email: kreich@wolfblock.com

11 JOSE R. ALLEN (California State Bar No. 122742)
   Skadden, Arps, Slate, Meagher & Flom LLP
12 Four Embarcadero Center, Suite 3800
   San Francisco, CA 94111
13 Telephone: (415) 984-6400
   Facsimile: (415) 984-2698
14 Email: Jose.Allen@skadden.com

15 Attorneys for Intervenor-Defendant
   East Kentucky Power Cooperative, Inc.
16

17              UNITED STATES DISTRICT COURT

18             NORTHERN DISTRICT OF CALIFORNIA

19                SAN FRANCISCO DIVISION

20 CENTER FOR BIOLOGICAL DIVERSITY,
   KENTUCKY ENVIRONMENTAL              Case No. C08-1240-MMC
21 FOUNDATION, and SIERRA CLUB
                                       **INTERVENOR-DEFENDANT EAST**
22                    Plaintiffs,      **KENTUCKY POWER COOPERATIVE,**
             vs.                       **INC.'S ANSWER TO PLAINTIFFS'**
23                                     **COMPLAINT**
   RURAL UTILITIES SERVICES, a federal agency
24 Within the United States Department of Agriculture

25                    Defendant,
                 and
26
   EAST KENTUCKY POWER COOPERATIVE,
27 INC.

28                    Intervenor-Defendant.

Intervenor's Answer to Plaintiffs' Complaint, Case No. C08-1240-MMC

1    Intervenor-Defendant, East Kentucky Power Cooperative, Inc. ("EKPC"), by and through its
2    undersigned counsel, hereby submits its Answer to Plaintiffs' Complaint and Request for
3    Declaratory and Injunctive Relief.  The paragraph numbers in this Answer correspond to the
4    paragraph numbers in Plaintiffs' Complaint.

5         1.    The averments in Paragraph 1 characterize Plaintiffs' Complaint and contain
6    conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 1 may be
7    construed to contain factual averments, those averments are denied.

8         2.    The averments in Paragraph 2 characterize Plaintiffs' Complaint and contain
9    conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 2 may be
10   construed to contain factual averments, those averments are denied.

11        3.    EKPC denies the averments in Paragraph 3.

12        4.    The averments in Paragraph 4 characterize Plaintiffs' Complaint and contain
13   conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 4 may be
14   construed to contain factual averments, those averments are denied.

15        5.    The averments in Paragraph 5 are a recitation of the relief sought by Plaintiffs, to
16   which no responsive pleading is required.  To the extent Paragraph 5 may be construed to contain
17   factual averments, those averments are denied.

18        6.    The averments in Paragraph 6 are conclusions of law, to which no responsive
19   pleading is required.  To the extent Paragraph 6 may be construed to contain factual averments, those
20   averments are denied.

21        7.    The averments in Paragraph 7 are conclusions of law, to which no responsive
22   pleading is required.  To the extent Paragraph 7 may be construed to contain factual averments, those
23   averments are denied.

24        8.    EKPC is without knowledge or information sufficient to form a belief as to the truth
25   of the averments in the first and third sentences of Paragraph 8, and therefore denies them.  The
26   averments in the second sentence of Paragraph 8 are conclusions of law, to which no responsive
27   pleading is required.

28

9. The averments in Paragraph 9 are conclusions of law, to which no responsive pleading is required. To the extent Paragraph 9 may be construed to contain factual averments, those averments are denied.

10. Whether this action is properly assigned to the San Francisco Division of this Court is a conclusion of law, to which no responsive pleading is required. EKPC is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in Paragraph 10, and therefore denies them.

11. EKPC is without knowledge or information sufficient to form a belief as to the truth of the averments in Paragraph 11 and therefore denies them.

12. EKPC denies the averments in the fourth sentence of Paragraph 12 regarding the absence of a legally and scientifically sufficient analysis of EKPC's proposed project. EKPC denies the averments in the fifth sentence of Paragraph 12 regarding the air quality impacts of EKPC's proposed project. EKPC denies the averments in the sixth sentence of Paragraph 12 to the extent they may be construed to aver that the NEPA analysis of Defendant Rural Utilities Service ("RUS") did not contain a full and fair comparison of alternatives. EKPC denies the averments in the seventh sentence of Paragraph 12. EKPC is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in Paragraph 12 and therefore denies them.

13. EKPC denies the averments in the sixth sentence of Paragraph 13 regarding the absence of a legally and scientifically sufficient analysis of EKPC's proposed project. EKPC denies the averments in the seventh sentence of Paragraph 13 regarding the air quality impacts of EKPC's proposed project. EKPC denies the averments in the eighth sentence of Paragraph 13 to the extent they may be construed to aver that RUS's NEPA analysis did not contain a full and fair comparison of alternatives. EKPC denies the averments in the ninth sentence of Paragraph 13. EKPC is without knowledge or information sufficient to form a belief as to the truth of the remaining averments in Paragraph 13 and therefore denies them.

14. EKPC admits the averments in Paragraph 14.

15. EKPC admits the averments in Paragraph 15.

16.     EKPC admits that in June 2007, RUS invited comments on an Environmental Assessment for the Proposed Smith Station CT Units 9 & 10 and the Smith-West Garrard Electric Transmission Project ("June 2007 EA").   The remaining averments in Paragraph 16 are characterizations of the June 2007 EA.  That document speaks for itself.

17.     EKPC admits that RUS prepared the June 2007 EA in response to a request from EKPC for possible financing assistance for the construction of two new combustion turbine electric generating units ("CTs"), fueled by natural gas, at EKPC's existing J.K. Smith Electric Generating Station in southern Clark County, Kentucky.  EKPC further avers that such financial assistance was requested for the construction of two new electric switching stations, one at the existing J.K. Smith Electric Generating Station and one in western Garrard County, Kentucky, and the construction of a 36-mile, 345 kilovolt electric transmission line that would extend through Clark, Madison and Garrard Counties, Kentucky, between the proposed new switching stations (the "Project").  EKPC denies the remaining averments in Paragraph 17.

18.     EKPC admits the averments in Paragraph 18.

19.     EKPC admits that RUS prepared the June 2007 EA in response to a request from EKPC for possible financing assistance for the Project.  EKPC admits that the construction of the proposed switching station in Garrard County, Kentucky, would affect approximately five to ten acres of land.  EKPC admits that the proposed new electric transmission line would require a 150-foot wide right-of-way, but further avers that where the proposed line would be co-located with, or parallel to, existing electric transmission lines, a portion of the existing right-of-way would be utilized by locating the proposed line as close as possible to the existing facilities.  EKPC denies the remaining averments in Paragraph 19.

20.     EKPC admits the averments in Paragraph 20.

21.     EKPC denies the averments in Paragraph 21.  While the June 2007 EA speaks for itself and is the best evidence of its contents, EKPC admits that RUS stated in the EA that the proposed new transmission facilities were needed to provide an outlet for the additional electric power that would be generated at the J.K. Smith Electric Generating Station as a result of the installation of the proposed new CTs.

1    22.    The averments in Paragraph 22 are characterizations of the June 2007 EA, which

2    speaks for itself and is the best evidence of its contents.  To the extent a responsive pleading is

3    required, EKPC denies the averments in Paragraph 22.

4    23.    The averments in Paragraph 23 are characterizations of the May 17, 2006 "System

5    Impact Study for Generation Interconnection Requests #30-33, J.K. Smith Combustion Turbines #8-

6    12 and CFB Unit #1 Project in Clark County, Kentucky" (the "System Impact Study"), which speaks

7    for itself and is the best evidence of its contents.

8    24.    The averments in Paragraph 24 are characterizations of the System Impact Study,

9    which speaks for itself and is the best evidence of its contents.

10    25.    EKPC denies the averments in Paragraph 25.  EKPC avers that the June 2007 EA

11    stated that construction of the proposed electric transmission line was tentatively scheduled to begin

12    in early 2008, with an estimated duration of construction of 18 months.

13    26.    EKPC admits the averments in Paragraph 26.

14    27.    EKPC admits that RUS issued a Notice of Finding of No Significant Impact with

15    respect to EKPC's request for possible financing assistance for the Project on September 19, 2007

16    (the "FONSI").  The remaining averments in Paragraph 27 are characterizations of the FONSI,

17    which speaks for itself and is the best evidence of its contents.

18    28.    EKPC admits the averments in Paragraph 28.

19    29.    EKPC admits the averments in Paragraph 29.

20    30.    EKPC admits that the proposed Project includes two new CTs to allow EKPC to meet

21    its projected electrical peaking demand in 2009-2011.  EKPC admits that it has proposed to construct

22    a 278 megawatt Circulating Fluidized Bed ("CFB") coal-fired electric generating unit at the J.K.

23    Smith Electric Generation Station (known as "Smith CFB #1") to allow EKPC to meet its projected

24    base load electrical demand by 2011-2012.  EKPC avers that it has considered the construction of a

25    second CFB unit at the J.K. Smith site to meet future base load demand, but that EKPC has not

26    applied to RUS for financing assistance for a second CFB unit and the need for a second CFB unit is

27    uncertain at this time.  EKPC further avers that the Kentucky Public Service Commission has not

28

issued a Certificate of Public Convenience and Necessity authorizing the construction of a second CFB unit at the J.K. Smith site.  EKPC denies the remaining averments in Paragraph 30.

31.    EKPC denies the averments in Paragraph 31, except that EKPC admits that the electricity generated by Smith CFB #1 would be transmitted over the transmission lines proposed as part of the Project.

32.    EKPC denies the averments in Paragraph 32.

33.    EKPC admits that RUS is preparing a Supplemental Environmental Impact Statement ("SEIS") in response to a request from EKPC for possible financing assistance for the construction of Smith CFB #1.  EKPC denies the remaining averments in Paragraph 33.

34.    EKPC incorporates by reference its responses to the averments in Paragraphs 1 through 33.

35.    The averments in Paragraph 35 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 35 may be construed to contain factual averments, those averments are denied.

36.    The averments in Paragraph 36 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 36 may be construed to contain factual averments, those averments are denied.

37.    The averments in Paragraph 37 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 37 may be construed to contain factual averments, those averments are denied.

38.    The averments in Paragraph 38 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 38 may be construed to contain factual averments, those averments are denied.

39.    The averments in Paragraph 39 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 39 may be construed to contain factual averments, those averments are denied.

40.     The averments in Paragraph 40 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 40 may be construed to contain factual averments, those averments are denied.

41.     The averments in Paragraph 41 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 41 may be construed to contain factual averments, those averments are denied.

42.     EKPC incorporates by reference its responses to Paragraphs 1 through 33.

43.     The averments in Paragraph 43 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 43 may be construed to contain factual averments, those averments are denied.

44.     The averments in Paragraph 44 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 44 may be construed to contain factual averments, those averments are denied.

45.     The averments in Paragraph 45 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 45 may be construed to contain factual averments, those averments are denied.

46.     The averments in Paragraph 46 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 46 may be construed to contain factual averments, those averments are denied.

47.     The averments in Paragraph 47 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 47 may be construed to contain factual averments, those averments are denied.

48.     The averments in Paragraph 48 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 48 may be construed to contain factual averments, those averments are denied.

49.     The averments in Paragraph 49 are conclusions of law, to which no responsive pleading is required.  To the extent Paragraph 49 may be construed to contain factual averments, those averments are denied.

1      50.     EKPC incorporates by reference its responses to Paragraphs 1 through 33.

2      51.     The averments in Paragraph 51 are conclusions of law, to which no responsive

3 pleading is required. To the extent Paragraph 51 may be construed to contain factual averments,

4 those averments are denied.

5      52.     The averments in Paragraph 52 are conclusions of law, to which no responsive

6 pleading is required. To the extent Paragraph 52 may be construed to contain factual averments,

7 those averments are denied.

8      53.     The averments in Paragraph 53 are conclusions of law, to which no responsive

9 pleading is required. To the extent Paragraph 53 may be construed to contain factual averments,

10 those averments are denied.

11      54.     The averments in Paragraph 54 are conclusions of law, to which no responsive

12 pleading is required. To the extent Paragraph 54 may be construed to contain factual averments,

13 those averments are denied.

14      55.     The remaining averments of the Plaintiffs' Complaint, under the heading "RELIEF

15 REQUESTED," are merely a recitation of the relief sought by Plaintiffs, to which no responsive

16 pleading is required. To the extent that those averments may be construed to contain factual

17 averments, those averments are denied. EKPC denies that Plaintiffs are entitled to the relief

18 requested, or to any relief whatsoever.

19      56.     Any other factual averment not specifically admitted in this Answer is denied.

20

21                      **Affirmative Defenses**

22      1.     Plaintiffs have failed to state a claim on which relief can be granted.

23      2.     RUS has complied with all applicable statutory and regulatory requirements and has

24 otherwise acted in accordance with law.

25      3.     Plaintiffs failed to join an indispensable party, EKPC.

26      4.     EKPC reserves the right to add such additional defenses as are discovered at any time

27 after the filing of this Answer and before the hearing on the merits.

28

1  WHEREFORE, Intervenor-Defendant EKPC respectfully requests this Court to enter an order:

2      1.    Dismissing the Complaint with prejudice; and

3      2.    Granting such other relief as the Court may deem just and proper.

4

5  Dated:  May 30, 2008                          Respectfully submitted,

6

7                                                  S/ JOSÉ R. ALLEN
                                                 JOSE R. ALLEN
8                                                Skadden, Arps, Slate, Meagher & Flom LLP
                                                 Four Embarcadero Center, Suite 3800
9                                                San Francisco, California 94111
                                                 Telephone: (415) 984-6400
10                                               Facsimile: (415) 984-2698
                                                 Email: Jose.Allen@skadden.com
11

12                                               TIMOTHY J. HAGERTY
                                                   *Pro hac vice application pending*
13                                               Frost Brown Todd LLC
                                                 400 W. Market St., 32nd Floor
14                                               Louisville, Kentucky 40202
                                                 Telephone: (502) 589-5400
15                                               Facsimile: (502) 581-1087
                                                 Email: thagerty@fbtlaw.com
16

17                                               KENNETH A. REICH
                                                   *Pro hac vice application pending*
18                                               Wolf, Block, Schorr & Solis-Cohen LLP
                                                 One Boston Place
                                                 Boston, MA 02108
19                                               Telephone: (617) 226-4003
                                                 Facsimile: (617) 226-4500
20                                               Email: kreich@wolfblock.com

21                                               Attorneys for Intervenor-Defendant
                                                 East Kentucky Power Cooperative, Inc.
22

23

24

25

26

27

28

1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                   **NORTHERN DISTRICT OF CALIFORNIA**

10                    **SAN FRANCISCO DIVISION**

11   CENTER FOR BIOLOGICAL DIVERSITY,              Case No. C08-1240-MMC
     KENTUCKY ENVIRONMENTAL FOUNDATION,
12   and SIERRA CLUB                               **[PROPOSED] ORDER**

13                    Plaintiffs,

14          vs.

15   RURAL UTILITIES SERVICES, a federal agency
     within the United States Department of Agriculture
16
                      Defendant.
17

18          This matter is before the Court on East Kentucky Power Cooperative, Inc.'s ("EKPC")

19   Motion to Intervene, responses thereto, and EKPC's reply.  The Court having reviewed the pleadings

20   filed in support and in opposition to the Motion, and the Court having heard the arguments of

21   counsel on the Motion, the undersigned hereby FINDS that EKPC satisfies the requirements under

22   Federal Rule of Civil Procedure 24 to intervene as a full party in all aspects of this action.  IT IS

23   HEREBY ORDERED that EKPC's Motion to Intervene in this action is GRANTED and movant will

24   be permitted to intervene.

25          IT IS SO ORDERED.

26

27   Dated:_____                   _____
                                                   Honorable Maxine M. Chesney
28                                                 United States District Judge